## MUSSELLEM et al. v. MAGNOLIA PETROLEUM CO. et al.

No. 13962—Opinion Filed March 11, 1924.

Rehearing Denied June 24, 1924.

Second Rehearing Denied Dec. 16, 1924.

(Syllabus.)

**1. Oil and Gas—Lease Contracts—Construction.**

A contract must receive such interpretation as to make it lawful, operative, reasonable, definite, and capable of being carried into effect, if such can be done without violating the intention of the parties, and this rule is likewise applicable to oil and gas lease contracts, as well as to other forms of contract.

**2. Same—Rights of Lessors in Casinghead Gas Production.**

S. M. and M. S. M., the plaintiffs in the instant case, allege in their petition that the defendants, M. P. Co. and others, had been producing from several oil wells, upon the land described in the petition, and belonging to the plaintiffs, large quantities of gas commonly known as casinghead gas, and had been for a period of several years manufacturing or distilling the same into commercial gasoline, in which form they had been marketing the same, receiving therefor large sums of money, and that the defendants had not accounted to the plaintiffs for any part of the moneys received therefor, except that the plaintiffs had received from each well so producing gas the sum of $50 per year as per the third clause of the contract herein set out. The lease contract under which the defendants produced the oil and gas, and that part thereof the construction of which is drawn in question by the instant suit, provides:

"In consideration of the premises, the said party of the second part covenants and agrees:

"First. To deliver to the credit of the parties of the first part, their heirs or assigns, free of cost, in the pipe line to which it may connect his well, the equal one-eighth part of all oil produced and saved from the lease premises.

"Second. To pay to the parties of the first part $300 each year in advance for the gas from each well, where gas only is found, while the same is being used off the premises, and the parties of the first part to have gas free of cost from any such well, for four stoves, and all inside lights in the principal dwelling house on said land, during the same time, by making his own connections with the well.

"Third. To pay the parties of the first part for gas produced from an oil well, and used off the premises at the rate of $50 per year for the time during which such gas shall be so used, said payments to be made each three months in advance."

Held: That said last named subdivision 3 of said contract, which provides in effect that the lessees shall pay to the lessors for gas produced from an oil well and used off the premises, at the rate of $50 per year for the time during which such gas shall be so used, conveyed to the lessees and their assignees, the gas arising from the oil well, and that the use thereof by the lessees as

in the instant case obligates them and their assignees to pay to the lessors the sum of $50 per year as per said provision, and the payment thereof operates to satisfy any and all claims due the lessors for such gas; and further held, that, from the record, the judgment of the trial court in favor of defendants was correct, and is affirmed.

Error from District Court, Oklahoma County; James I. Phelps, Judge.

Action by Sophia Mussellem and another against the Magnolia Petroleum Company and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

F. E. Riddle, F. G. Viger, and Joe T. Dickerson, for plaintiffs in error.

W. H. Francis, A. S. Hardwick, B. B. Blakeney, Hubert Ambrister, and John Rogers, for defendants in error.

BRANSON, J. The plaintiffs herein, Sophia Mussellem and M. S. Mussellem, sued the defendants, Magnolia Petroleum Company, McMann Oil Company, and National Products Company, for a large sum of money. The trial court sustained a demurrer to the plaintiffs' evidence, rendered judgment in favor of the defendants, dismissing plaintiffs' petition, and they have appealed to this court. The parties appear in this appeal as they appeared in the court below, and they will be referred to herein as they appeared in that court.

Stating merely the important part, in substance, of the lengthy pleadings, we find that on June 24, 1921, plaintiffs sued the defendants in the district court of Oklahoma county for damages, sounding in conversion, for the alleged taking and appropriation by the defendants of certain casinghead gas and gasoline without the consent of the plaintiffs. Plaintiffs assert that they owned in fee a certain tract of land located in Creek county, Okla., on which they executed, February 3, 1913, to C. G. Kiskaddon, an oil and gas mining lease, the material parts of which will be set out later. That said Kiskaddon had sold and assigned said lease to the defendant the McMann Oil Company, which had in turn sold and assigned the same to the defendant the Magnolia Petroleum Company, which last named company had made a contract with the defendant the National Products Company to use the casinghead gas arising from the oil wells drilled upon the land to make gasoline; that there were 25 oil wells drilled on the property; that the casinghead gas coming from said wells had, without plaintiffs' consent and without any right thereto, been taken by the defendants and each of them, and manufactured into gasoline for

commercial use, sold, and the proceeds thereof appropriated by the defendants without paying to the plaintiffs the amount due them therefor, and that the appropriation of said casinghead gas and conversion of the same into gasoline had covered a period of approximately seven years.

Plaintiffs further charge that the defendant, the National Products Company, under a contract, the exact nature of which plaintiffs do not plead, as they allege, for want of knowledge, was manufacturing and had manufactured large quantities of gasoline from the casinghead gas taken from the wells located on said property, and that it should be held jointly liable with the other defendants therefor.

To this petition the defendants pleaded separately, denying the allegations of the plaintiffs' petition, except as to those matters specifically admitted. The defendant the Magnolia Petroleum Company, pleaded that prior to November 30, 1916, it had no interest in said oil and gas lease, but that on said last named date it became the owner thereof, but that it had fully complied with each and every provision of the lease, and strictly conformed to all of its terms, and paid all royalties thereon provided to be paid to the plaintiffs, and had paid for the casinghead gas referred to, and that plaintiffs had accepted such payments, covering a period of seven years, with full knowledge of all the facts as to the conduct of this defendant touching the premises.

The answer of the other defendants was in effect the same. It was further pleaded by the defendants that the plaintiffs knew of the intended sale before its consummation, by the McMann Oil Company, to the Magnolia Petroleum Company, of the oil and gas lease covering the land, and were thoroughly conversant with the nature of the operations upon said lease, and the fact that the casinghead gas coming from the oil wells on said lease was being manufactured by the National Products Company into gasoline, and that the plaintiffs had accepted, under clause "Third" of the said lease, $50 per year as royalty, as per the contract of said lease, and that the said plaintiffs were estopped from claiming damages sought to be recovered.

The defendant Magnolia Petroleum Company, pleaded the statute of limitations as a bar, in addition to its other defense, for a period of two years before the filing of the suit.

For reversal, the plaintiffs assigned sev-

eral errors in addition to the formal assignment that the trial court committed error in sustaining the demurrers of the defendants, and rendering judgment in their favor dismissing plaintiffs' cause of action, all of which, important to the determination of this cause, may be summarized in the allegation, first, that the trial court erred in holding that paragraph 3 of the lease contract in question conveyed to the defendants casinghead gas and gasoline manufactured therefrom; and, second, in not holding that casinghead gas and gasoline manufactured therefrom were not in the minds of the contracting parties, and were not taken into consideration in the execution of the oil and gas lease in question; and, third, that the court should have held that casinghead gas and gasoline manufactured therefrom was neither oil nor gas in the ordinary acceptation of those terms and that casinghead gas partook of both of the ingredients of gas and oil.

The plaintiffs further state:

"These three propositions are virtually controlled by the same rules of law, and are likewise based upon practically the same state of facts, and will thus be argued together."

The pertinent part of the oil and gas lease, the provisions of which are the basis of this litigation, is as follows:

"In consideration of the premises, the said party of the second part (Kiskaddon and his assignees) covenants and agrees:

"First. To deliver to the credit of the parties of the first part (the plaintiffs herein), their heirs or assigns, free of cost, in the pipe line to which it may connect his well, the equal one-eighth part of all oil produced and saved from the lease premises.

"Second. To pay to the parties of the first part $300 each year in advance for the gas from each well, where gas only is found, while the same is being used off the premises, and the parties of the first part to have gas free of cost from any such well, for four stoves, and all inside lights in the principal dwelling house on said land, during the same time, by making his own connections with the well

"Third. To pay the parties of the first part for gas produced from an oil well, and used off the premises, at the rate of $50 per year, for the time during which such gas shall be so used, said payments to be made each three months in advance.

"The party of the second part shall have the right to use free of cost gas, oil and water produced on said land, for its operation thereon, except water from the wells of first party."

The last three above mentioned clauses, creating the obligations of lessees to lessors, will be referred to herein as the "first obligation," the "second obligation," and the "third obligation."

This suit does not draw in question the failure of either of the assignee defendants to fully comply with the first and the second obligations, but the fight rages around the third obligations, which is, to repeat, that lessee agrees "To pay the parties of the first part for gas produced from an oil well, and used off the premises, at the rate of $50 per year, for the time during which such gas shall be so used."

Arguing the above summarized assignments, plaintiffs say that this language does not purport to sell and vest title in all the gas produced from an oil well, or oil wells, but it is limited to such as is "used off the premises by the lessee," and for the period which the lessee elects to so use such gas; that the lessee does not agree to pay unconditionally the sum of $50 a year for gas from each well, nor the sum of $50 a year for the gas used by the lessee from each oil well, but only to pay that amount "for the time during which such gas shall be so used." That this provision was no doubt inserted in this manner for the reason that the lessee might have adjoining leases that certain parts of the year would furnish sufficient gas for operating purposes, but other portions of the year would be insufficient, and for that reason it was provided that the lessee should only pay for the time during which such was used off the premises. That it was optional with the lessee if he should use the gas at all, and also as to what period of any one year he was to use the gas. That if the only interest the lessor was to have in the production and utilization of such gas was $50 per year, then plaintiffs say that the limitations in this paragraph are surplusage, and the language limiting its use has no meaning. Plaintiffs further say, if the questions as to whether or not paragraph 3 of the oil and gas lease includes casinghead gas and the right to manufacture gasoline therefrom is involved in doubt, then such doubt must be resolved in favor of the plaintiffs.

In short, the damages asserted by plaintiffs are in the nature of conversion of a product as to which they claim the parties did not contract in the lease, and no title to which was passed by the clauses of the lease to the lessee or his assignees. The

defendant asserts that the third obligation clause passed title to the gas to them or the option to use the°same, and in event of its exercise they were bound to comply with is payment terms, and that they did comply with its terms during a period of 7 years, and paid the plaintiffs as per the third obligation; and the defendants further assert that if any ambiguity existed in the language of said third obligation, that with full knowledge of the manner and method and place of the utilization of the gas coming from the said 25 oil wells located on the property, the plaintiffs had been regularly and fully paid, as per the terms of their contract, and that they accepted the payments in full settlement of the gas coming from the oil wells, and the parties thereby interpreted its meaning as contended for by the defendants.

Plaintiffs do not dispute that the proper amount had been paid by defendants under the terms of the said third obligation, if it covered, in contemplation of the contract, the character of the product herein questioned, and as used. Did it, or did it not? That is the question.

Looking to the briefs and the record, we find the husband of the principal plaintiff, M. S. Mussellem, was engaged in the oil business. The title to the land on which the lease was executed was in the wife, Sophia Mussellem, but he was a party to the lease contract, which was a form in general use by those so engaged. The land was located in the oil section of Creek county. As is always true in lease contracts which carry the right to prospect for oil and gas, the moving purpose was exploration for such minerals. Both parties had in mind:

First, that oil in paying quantities might be found, in which event, the duty of lessee to lessors was that set out in said first obligation;

Second, that a well drilled might produce gas only, in which event the duty of the lessee was that set out in the said second obligation; and

Third, that if wells produced oil, the same wells might or would produce gas also, it being well known that gas was produced in greater or lesser quantities from wells producing oil, in which last event the duty of the lessee was that as set out in the said third obligation.

There is a confusion of terminology indulged in by counsel in the use of "casinghead gas" and "casinghead gasoline." In fact, the argument made impels the idea that plaintiffs' suit is for conversion of gasoline which they allege came from the land leased, and is based on the theory that the contract failed to convey any such product. The pleadings and the arguments contained in the brief confuse "gas coming from an oil well," "casinghead gas," and "gasoline." The position of the plaintiffs apparently being that they are entitled to all or a certain portion, or its value, of the gasoline; that the lease not having mentioned gasoline, their cause of action was well pleaded, and their evidence supported their right to the recovery sought.

The record discloses that this finished article called "gasoline" is and was produced by a process of manufacture or distillation from what is referred to in the pleadings, the record and the briefs as "casinghead gas." Casinghead gas is not referred to in the lease contract, and again in the terminology of the record is confusing, except in the light which the record itself throws on the same.

With the evident purpose of serving their contention, the plaintiffs introduced a witness who qualified as one well experienced in the oil and gas business, and of several years of scientific knowledge as to the products arising from gas wells and oil wells, as well as experience in utilizing such products. This witness, Mr. Frame, testified, as set out in the brief of the plaintiffs, among other things, that:

"Casinghead gas is just gas from an oil well that comes up through the casing and comes out through what they speak of as the top of the casing, called the casinghead; it is simply gas from an oil well that is casinghead gas; casinghead gas as a rule is in smaller volumes than gas from a gas well, carries a larger proportionate volume of the heavier hydrocarbons than ordinarily, or in all hydrocarbon gases. The application of pressure to the natural gas causes the gasoline part of this casinghead gas to come out as a liquid. The oil profession of technical men that I have talked to, including geologists and mineralogists, all consider casinghead gas as gas, and not oil."

On redirect examination, the witness stated:

"That he came to Oklahoma in February, 1913; that after having read about the Hope Company making gasoline from casinghead gas in West Virginia, we decided right away that we could make a commercial gasoline. * * * I presume that the oil profession knew very little about the matter then, and I presume it was new to the oil men generally until 1915. * * * We find dry gas both coming from oil wells

and gas wells. Casinghead gas comes from the Layton and Bartlesville oil sand. Q. Casinghead gas, though, partakes of both oil and gas contents? A. Why, you get right down to the composition of the gas and oils, they are all hydrocarbons. Q. Gasoline made from casinghead gas partakes both of the oil and gas, doesn't it. and not exclusively of either? A. You are just getting me where I would hate to say that—as I was going to explain—Q. Well, you know what oil is, don't you? A. Well, I know when I see it—but you see, the first mechanical composition of oil is light. You see then a heavy hydrocarbon, so where it is heavy, you get a fluid, and you go on up from the heavy to the various contents in the crude oil. Q. But the question I ask you, does not casinghead gas and gasoline manufactured from casinghead gas partake of both oil content and also of the gas, and not exclusively of either: isn't that a fact? A. Well. I could not say: I would not say that it does, or—Q. And you would not say that it doesn't? A. No, sir. The casinghead gas comes out of the well from the oil sand. Q. Does it partake of any of the ingredients of oil at all? A. A portion of the heavier gasoline that can be condensed out of the casinghead gas might correspond to some of the gasoline that could be distilled out of oil, but as a rule, it would not condense. What I am getting at is this: As it reaches the atmosphere, these gasoline gases or vapors, which go to constitute casinghead gas are not fluid. Q. Gasoline is a fluid. A. It is, when it is collected from the other constituents of this natural gas, but being held with lighter parts of this gas it comes out of the well as a gas."

This testimony discloses that the gas which comes from an oil well passes through the casing, making its exit through the head of the casing, and from this it receives the designation of "casinghead gas," which is no other than gas from an oil well. This evidence further discloses that while the so-called "casinghead gas" is a gas as is ordinarily understood, its chemical constituents would disclose that it has a content called hydrocarbon, which content is also found in petroleum, as well as so-called dry gas.

The definition is not foreign to that plaintiffs quote from the regulations of the Interior Department, to wit:

"Casinghead gas—The gas from an oil well coming through the casing, with the oil from oil producing strata. 'Westcott, an eminent petroleum geologist and chemist, at page 33 of his text entitled 'Hand Book of Casinghead Gas' (2nd Ed.) says:

" 'The statement is sometimes made that the gasoline in the casinghead gas is derived from the crude oil. This is incorrect when used in the sense that the casinghead gas takes gasoline from the crude oil. As previously explained, all the petroleum hydrocarbons were probably formed at the same time and it would be just as logical to say that the crude oil takes gasoline from the casinghead gas. It is probable that when the oil and gas are under great pressure. as they usually are before the oil sand is penetrated by the drill, that a part of the gas is dissolved in the oil just as carbon dioxide is dissolved in water to make soda water, and that when the pressure is relieved, the gas separates from the oil just as the carbon dioxide in soda water separates from the water, yet we could not call the carbon dioxide water nor would we call the water carbon dioxide.' "

"In a publication of the Bureau of Mines of the Department of the Interior in Bulletin 148. by J. O. Lewis, at page 11, in treating of 'The Solubility of Gases in Petroleum,' is the following language:

" 'The gas held in solution by the oil is an especially important factor in the recovery of oil from the formations in which it is found. Under the same conditions of temperature and pressure a particular oil will absorb a fixed proportion of a particular gas, but this proportion of coefficient of absorption, as it is called, varies with each oil and each gas. The gas is held absorbed in the oil in the same way that soda water is charged with carbon dioxide. The proportion of gas absorbed is increased under high pressures, in accordance with Henry's law of gases. Enormous quantities of gas are held in solution under the high initial pressure found in some oil wells. Some of the constituent gases are condensed at these high pressures just as in a compressor plant. and as long as high enough pressure is maintained exist as liquids dissolved in the oil. Under such conditions the gas is not absorbed as a gas, but as one liquid dissolved in another, and a much greater proportion of gas can be held in solution when in liquified form than when uncondensed. Other gases (methane, ethane and propane) are never liquified at the pressures and temperatures in oil sands penetrated by wells, but are always found as gases dissolved or absorbed in the oil. These constitute the so-called dry gases.' " (See, also, Johnson & Huntley's text-book, entitled "Oil and Gas Production," page 1.)

From the above treatises, it appears that in the evolution of the process of making natural gas gasoline, it is found made not alone from casinghead gas. but from dry natural gas as well, the same elements being present in so-called "dry natural gas" as in "casinghead," though not perhaps in such abundance.

Westcott's Hand Book of Casinghead Gas, pages 34 and 35, says:

"* * * If the gasoline were taken from the crude, we would expect the gravity of the crude to become much heavier when a vacuum was placed on the wells and presumably took the gasoline from the crude. This, however, is not the case. For example, the average gravity of the crude oil produced from six leases, scattered over the Glenn Pool in Oklahoma, the test covering five days, January 9th to 13th, 1911 (two years before the Glenn Pool field was put under the vacuum) was 36.8 degrees Be. The gravity of the oil from these six leases on January 23rd, 1918, which was under a vacuum of 18 to 20 inches, averaged 36.3 degrees Be., or only one half degree heavier gravity in six years. For every four barrels of crude oil, 36.3 degrees Be., these leases now produce, they also produce a barrel of casinghead gasoline having a gravity ranging from 9 to 95 degrees Be. If the crude oil and gasoline were mixed in the proportions in which they are produced, the mixture would have a gravity of nearly 47 degrees Be., which is far lighter than the crude oil produced from this field when the wells were first drilled in; therefore, this casinghead gasoline could not have come from crude oil: also the fact that the crude oil from the above mentioned leases was only five-tenths of a degree heavier after six years, during the last four of which the wells were under 18 to 20 inches vacuum, shows that the vacuum removes very little, if any, gasoline from the crude."

In volume 2 of "American Petroleum Industry," by Bacon and Hamor, certain definitions are given of natural gas. They are as follows: Generally, it is a gaseous product arising from petroleum wells. It is divided into two classes, dry natural gas and wet natural gas. Dry natural gas is defined as "Natural gas which does not contain an appreciable amount of readily condensible gasoline. It is usually not intimately associated with petroleum." Wet natural gas is defined as "Natural gas from which a gasoline can be extracted in sufficient quantities to warrant the installation of a plant, or natural gas which contains readily condensible gasoline."

It would therefore appear from these scientific treatises on the subject that there is in fact no atomic difference between dry natural gas and wet natural gas, except in the degree they may contain condensible gasoline.

One of the contentions made by the plaintiffs is that the manufacture of gasoline from such gas as herein in question was unknown in 1913, and therefore the minds of the parties did not meet on this matter, and there was therefore no contract in relation thereto. Yet it would appear from the cita-

tions in the briefs and the record that gasoline had been so made as far back as 1904. But even if such contention were true, we perceive no different result to be reached, for by the contract the lessor sold

First, the oil produced and saved;

Second, the gas from the gas well; and

Third, the gas from an oil well.

From the above citations of the evidence, the definitions of such gas as here in question, from the departmental regulations and the scientific treatises on the subject, "casinghead gas" is nothing other than gas from an oil well, and to concur in the contention made by plaintiffs would be tantamount to writing a modification into the third clause of the contract. The assignments of error are only directed at the alleged erroneous holdings of the trial court, as set out supra. The trial court made no holding with reference to gasoline manufactured either from gas, wet or dry, or from petroleum itself. Such question was not there, and is not here. But as to the interpretation of the third clause of the contract, in the light of the evidence in the record, the scientific definitions and discussions, above set out, we fail to find any fault in the holding of the trial court that the lease contract passed the title to that substance which was generally known to come from an oil well and familiarly designated as gas, and the holding was not erroneous in the light of the common acceptation of the terms used, as well as scientific knowledge on the subject.

Whether or not the gas from an oil well known as "casinghead gas" was known to be valuable for gasoline purposes, we think is immaterial. It might be conceded that there was a difference in consideration mentioned in the lease for gas from an oil well, and gas from a purely gas well, because, as plaintiffs contend, the value of the former for making gasoline was not generally known; but the parties had a right to contract as to each of the products which might be found on development of the premises, and having done so, the fact that the process of greater utilization of the gas for gasoline purposes was not generally known, would not alter the power to contract, or the contract as made.

If to the lessee and the assignee defendants, from a developed knowledge of greater utilization, such product produced more lucrative amounts than might have been anticipated by the lessors, this certainly could not alter the rights relative to such commodity which paragraph 3 conveyed to the

defendants. With no greater reason could this be true as to gas coming from an oil well than if the crude petroleum itself by a newly devised scientific process of greater utilization might receive a marketable value far in excess of that which it had at the execution of the lease, would alter the amount lessors should receive therefor.

Section 5047, Compiled Statutes of Oklahoma for 1921, provides:

"The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage. in which case the latter must be followed."

Section 5046, Compiled Statutes Okla. 1921, vol. 2, provides:

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties."

(Lemp v. Armengal, 86 Tex. 690, 691; Callison v. Gray, 25 Tex. 87; McCalister v. Texas Co. [construing an oil and gas lease] 223 S. W. 859; Hearne v. Gillett, 62 Tex. 26, and Lovelace v. Southwestern Petroleum Co., 267 Fed. 504.)

If in fact the contract in question needed the application of any rule of construction to throw light upon the meaning of the parties, as contained in the language used, we think that these sections of the statute, the text and the cases cited, lay down the rule, which shows that the contract in question is not ambiguous. The provision is that payment of $50 per year shall be made for "gas produced from an oil well." It has been shown, supra, that casinghead gas, referred to in the record, is nothing other than such gas so produced, and this phraseology is not ambiguous.

In the case of Mathes et al. v. Shaw Oil Co., 80 Kan. 181, 101 Pac. 998, the Supreme Court of Kansas, in discussing an oil and gas lease, said:

"The further condition was added, 'if however, second party shall use, market, or sell gas from any well producing gas, it shall pay. * * *' This indicates that gas shall be paid for if used by the defendants for any purpose other than for drilling; the purpose for which the gas is used by the defendants, rather than the amount produced by the well, being a test as to when the rent shall be paid. * * * The fact that this might compel the defendants to pay rent for gas and royalty for oil out of the same well,

does not seem important. The lessors should of right have what oil and gas his premises produce, whether it is taken from one well, or several wells."

In the case of Withington v. Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634, this court, in discussing the gas provision of an oil and gas lease, used this language:

"The language 'If the party of the second part should market any gas from any well producing gas' is not limited to gas produced in any one of the forms above mentioned, but is sufficiently comprehensive to include them all and applies to gas marketed, whether from a well producing gas only, or from a well producing both oil and gas. * * * We have been unable to draw any distinction from the language of the contract itself in the gas from the oil wells and that produced from the wells producing gas only."

It would appear, therefore, as practically beyond the realm of serious controversy that an oil well from which gas is produced from any stratum is clearly within the purview of the language of the third clause of the contract in question, and that the obligation of the lessee as contained in said third clause is the contract compensation which the lessors should receive therefor. But the plaintiffs say, if this part of the third clause is considered unambiguous, that $50 per year for the gas from each oil well producing gas, under the language of the contract, had in contemplation only gas used "off" the premises. and that the gas utilized by the defendants was utilized "on" the premises. This seems to us to be an effort to have the court find there was something in the contract which the parties did not understand to be there. Another clause of the contract provides that the lessee should have free of cost any gas produced for the development and use "on" the premises. For any gas coming from an oil well and used "off" the premises, $50 per year was to be paid. The words "on" and "off" are correlatives, and to determine what the latter means might be best reached by a proper conception of what the word "on," as used in the lease, conveyed. It had no other meaning than used in connection with the development of the premises. The words "off the premises" had no other meaning to the parties than if the gas was appropriated to a purpose foreign to utilization for the benefit of development of the property itself. In other words, it did not have particular reference to place where used, but the purpose and objects of its use, to wit, one foreign to the development of the premises in question. If there could be any doubt in regard to this, the record discloses that for a pe-

riod of seven years, with the knowledge that the defendants had erected a gasoline condensing plant for making casinghead gasoline out of the gas coming from the oil wells, plaintiffs had accepted the rentals under said obligation three, and appropriated them to their own use, and if this provision of the contract can with any degree of reason be considered as ambiguous, the interpretation thereof as given is controlling.

The record discloses many vouchers made payable to the plaintiffs, which showed upon their face that they were in payment in accordance with the third provision of said lease, and which further showed that they were accepted by the plaintiffs in full settlement of the casinghead gas on the wells in question, for the period designated.

In 13 C. J., page 546, we find the author uses the following language:

"Where the parties to a contract have given it a practical construction by their conduct, as by acts in partial performance, such construction is entitled to great, if not controlling weight, in determining its proper interpretation, particularly where such interpretation is agreed on before any controversy has arisen."

In the case of Bearman v. Dux. Oil & Gas Co., 64 Okla. 147, 166 Pac. 199, this court made this rule applicable in the construction of an oil and gas lease.

In the case of Scott v. Lafayette Gas Co. (Ind. App.) 86 N. E. 495, the court said:

"When the language of a contract is of doubtful construction, the interpretation by the parties themselves is entitled to great weight, and may control. and the construction thus placed by them will be adopted by the court, unless it be at variance with the correct legal interpretation of the contract."

(Smith v. Board of Comm., 6 Ind. App. 153, 33 N. E. 243; Ralya v. Atkins Co., 157 Ind. 331, 61 N. E. 726; Ewing v. Wilson, 132 Ind. 223, 31 N. E. 64, 19 L. R. A. 767; Frazier v. Myers, 132 Ind. 71, 31 N. E. 536; Louisville, etc., R. Co. v. Reynolds, 118 Ind. 179, 20 N. E. 711; Vinton v. Baldwin, 95 Ind. 433; Reissner v. Oxley, 80 Ind. 580; Chicago v. Sheldon, 9 Wall. 50, 19 L. Ed. 594; Steinbach v. Stewart, 11 Wall. 566, 20 L. Ed. 56; Topliff v. Topliff, 122 U. S. 121, 7 Sup. Ct. 1057, 30 L. Ed. 1110: Beach on

Contracts, pp. 721-2; 17 Amer. & Eng. Ency. of Law [2nd Ed.] 23-25.)

In the case of Wiebener et al. v. Peoples, 44 Okla. 33, 142 Pac. 1037, this court adopted this language:

"Where the language of a contract is uncertain, and the parties thereto, by their subsequent acts and conduct have shown that they construed it alike, and within the purview of the constructions permitted as possible by such language, the courts will ordinarily follow such adopted construction as the correct one."

(Minnetonka Oil Co. v. Cleveland Vitrified Brick Co., 27 Okla. 180, 111 Pac. 326.)

In the case of Kelley v. Harris, 62 Okla. 236, 162 Pac. 219, this court said:

"This seems to be recognized by his own conduct, and the rule has oftentimes been expressed by this court that where construction of a contract is in doubt, the act of the parties thereunder will be frequently resorted to for the purpose of ascertaining how they construed it."

And, again, in the case of Rida v. Morgan, 31 Okla. 98, 119 Pac. 958, Justice Kane said:

"Where the meaning of the terms used in a written contract is not clear. the subsequent acts of the parties showing the construction they have put upon the agreement themselves, are to be looked to by the court."

The plaintiffs lay great stress upon the case of Hammett v. Gypsy Oil Co., 95 Okla. 235, 218 Pac. 501. That case is not in conflict with what is here said. In that case, the question was whether the assignor could recover 40 per cent. of gasoline made from oil well gas, when the reservation for lessor was 40 per cent. of oil only. The contract made no provision for payment for gas from an oil well. The finding in that case merely sustained the holding of the trial court, that gas from an oil well was neither oil nor gas, under either of the clauses of the contract there in question. But the lease contract in this case has a clause which specifically fixes the rights of the parties as to gas from an oil well.

For the reasons given, we think that the judgment of the trial court in favor of the defendants was a correct judgment, and the same is therefore affirmed.

JOHNSON, C. J., and HARRISON. LYDICK, and WARREN, JJ., concur.