BREA CANON OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 42487, 48028, 55079, 61415, 71291.

Promulgated February 20, 1934.

*George H. Koster, Esq.,* for the petitioner.
*J. E. McFarland, Esq.,* for the respondent.

#### OPINION.

LANSDON: The respondent has determined deficiencies for the years 1926, 1927, 1928, 1929, and 1930 in the respective amounts of $7,294.79, $12,688.46, $7,890.69, $5,084.49, and $6,945.08, or a total of $39,906.51. Two issues are pleaded in the amended petition: (1) whether depletion is allowable at the rate of 27½ percent on the total gross income realized from the sale of gasoline extracted from casing head gas produced by the petitioner from its

own wells, and (2) the correct depreciation deduction on account of wear and tear of physical assets owned by the petitioner and used in its business in the taxable year. The several proceedings were consolidated for hearing and report. Except an affidavit received in evidence by agreement of the parties, the facts have been stipulated as follows:

The petitioner is a corporation organized under the laws of the State of California with principal office at Los Angeles, California. It has filed its income tax returns for all years involved in this proceeding at the office of the Collector of Internal Revenue at Los Angeles, California.

The Commissioner of Internal Revenue has understated depreciation allowances to which petitioner is entitled for 1926 to 1929, inclusive, in the respective amounts of $9,803.37, $9,078.62, $8,927.19 and $3,515.20, and the taxable net income for each of said years, as shown by the deficiency letters attached to the petitions filed by the petitioner in these proceedings, should be reduced by the amount of the additional depreciation allowable for each of the years respectively, as above stated.

Should the Board find that petitioner is entitled to include its entire income from gasoline sales to determine gross income for percentage depletion purposes, the correct depletion deduction for each of the years involved in this proceeding is as follows: 1926, $402,712.94; 1927, $440,649.28; 1928, $271,540.00; 1929, $222,513.31; and 1930, $296,550.35.

Should the Board find that petitioner is not entitled to include income arising as a result of the processing of casing head gasoline amounting to sixty percent of income from gasoline sales, to determine gross income for percentage depletion purposes, the depletion deduction for each of the years involved in this proceeding is as follows: 1926, $365,587.72; 1927, $365.004.21; 1928, $201,608.26; 1929, $173,026.37; and 1930, $240,538.31.

All gasoline sold by the petitioner during the years 1926, 1927, 1928, 1929 and 1930 was extracted from casing head gas produced from the petitioner's own oil and gas wells from its own oil and gas properties located in Orange County, State of California.

By stipulation at the hearing the affidavit of Roger F. White was admitted in evidence. White was graduated from the Colorado School of Mines in 1918, with the degree of Engineer of Mines. He was in the service of the Bureau of Internal Revenue for three years as a petroleum valuation engineer and for a time was assistant chief of the engineering section thereof, and for the eight years last preceding the hearing he practiced his profession in Los Angeles as consulting engineer, specializing in the appraisal of oil and gas properties and the preparation of geological reports concerning such properties proven and prospected. In his statement agreeing that the White affidavit should be admitted in evidence, counsel for the petitioner expressly said that he was stipulating only that if present the affiant would testify as in the affidavit. So far as material to the issue here the testimony thus adduced was as follows:

In the majority of oil fields of California, the producing zones consist of alternate sedimentary beds of sands, shales and sandy shales which are often

hundreds of feet in thickness and which contain an intimate mixture of oil, gas and gasoline, as well as other hydrocarbon substances.

The principal products of a typical California oil well are oil and wet gas and in their natural state, that is, before disturbance by drilling, these products are so thoroughly mixed that they may be considered to be one homogenous substance since they are hydrocarbons of similar chemical and physical characteristics. The most variable characteristic is volatility which is greatly affected by heat and pressure changes. The most volatile constituent is so-called wet gas which is in a large part dissolved in the oil until the body is disturbed by the drilling.

When a well is drilled into the oil zone an outlet or source of escape is provided which releases the pressure and causes the more volatile gases, known as casing head gas, or wet gas—a mixture of gasoline and gas, to pass off. Great quantities of dry gas and gasoline remain in the petroleum or oil which comes to the surface as a fluid and can be obtained by the simple process of heating. Indeed, if allowed to stand in an open tank, a portion of the more volatile substance will evaporate, leaving a residue oil of lesser specific gravity and leaner in gasoline content. In other words, the physical state of the substance depends entirely upon the condition of heat and pressure and if the gas is compressed, it will revert to the liquid form. A typical California oil well produces crude oil as a fluid and wet gas, a mixture of vapor and gas.

The casing head gas, by compression and absorption, is separated into a liquid known as gasoline and a gas known as dry gas. This gasoline is very volatile. It partakes of the nature of a very high gravity oil and will evaporate rapidly if not confined.

In the computation of its depletion deductions for each of the years under review, the petitioner has included the gross income from its sale of gasoline extracted from casing head gas produced from its own oil and gas properties as a part of its gross income from such properties. The respondent has held in effect that the gasoline sold by petitioner is a finished product manufactured from raw material, that not more than 40 percent of the proceeds from the sale of such produce should be regarded as income from the gas and oil properties, and that as much as 60 percent of such income is realized from manufacturing or processing operations.

Depletion of natural mineral resources is a statutory concept that was not recognized in the Excise Act passed by Congress in 1909. Up to that time and under that act all the proceeds derived from the exploitation of a natural resource reserve were regarded as income, reducible only by the costs of operation and by a reasonable allowance for the depreciation of the physical property used in the recovery of the ores. *Stratton's Independence, Ltd.* v. *Howbert*, 231 U.S. 399. This harsh rule was afterwards abrogated.

Under the provisions of all the revenue acts from 1913 to 1932, inclusive, a reasonable deduction on account of depletion of a natural resource is allowed to a taxpayer in proportion to his interest therein. In each of such acts the provision is either a part of or closely related to that section of the law which authorizes depreciation deductions

on account of the wear and tear or exhaustion of properties owned by a taxpayer and used in his trade or business for the production of income. It is well established that allowances for depreciation are based upon the principle that a taxpayer is entitled to tax-free recovery of his capital investment in wasting assets used in his trade or business. There can be no question that allowances for depletion of natural resources were originally based on the same principle. *Ludey* v. *United States*, 274 U.S. 295. They continue to be so regarded except as to oil and gas reserves. Congress expressly recognized this principle in section 5 (a) (8) of the Revenue Act of 1916 by providing that when allowances for depletion equaled cost or value at March 1, 1913, no further deductions would be allowed.

For many years allowances for depletion were based universally on the taxpayer's capital cost of his mineral reserves and in such years it was not questioned that the purpose thereof was the return of capital investment tax-free. The first departure from this rule appeared in the Revenue Act of 1919, in which the concept of discovery value was included and defined. Depletion on such value instead of cost applied to mines and oil and gas properties and was intended to encourage the exploration and development of new fields, a type of business adventure that is highly hazardous financially and extremely expensive. In this new concept the element of reasonableness was retained, but expanded to include a reasonable reward for the risks taken in developing new areas of production.

In all the revenue acts up to 1926 the reasonable allowance for depletion was computed on the basis of the cost of an estimated volume of the reserve at date of purchase or of value at March 1, 1913. The element of discovery value introduced into the Act of 1919 required additional estimates and approximations, including the fair market value of the property at or within 30 days of discovery, but even then there was no complete departure from the principle that depletion is allowable to permit the tax-free return of capital investment in an exhaustible asset.

It is obvious that under the pertinent provisions of all revenue acts from 1913 to 1924, inclusive, the computation of a reasonable allowance for depletion involved many difficulties, such as estimates of the volume of depletable reserve at date of acquisition and, after 1919, proof of market value at or within 30 days of discovery. Probably solely for the purpose of simplifying the computation of such allowances the Act of 1926 provides at section 204 (c) (2)[1] for annual

---

[1] (2) In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph.

depletion deductions from income produced from oil and gas properties only, to be measured by 27½ percent of the gross income therefrom, with certain limitations as to the amounts thereof based on a percentage of the net income from the property, which we may presume were added to bring the new rule within reason.

In many producing areas, among other products from oil wells, are great volumes of wet gas, now commonly called casing head gas, which by fairly simple processing may be converted into a high grade of commercial gasoline. This product is usually disposed of by the owner of producing properties through a contract of sale, sometimes called a lease, under which the purchaser or lessee agrees to buy the wet gas at the mouth of the well and pay the seller an agreed rate per 1,000 cubic feet. The purchaser transfers the gas from the well through pipe lines installed at his own cost to his plant where the gasoline is extracted and sold. After a time the processors of wet gas began to claim depletion deductions on the income realized from casing head contracts. The Commissioner denied such claims and the question finally came to the Board.

In *Una Gasoline Co.*, 22 B.T.A. 45, we held that casing head gas as it emerges from the well is the personal property of the owner of the producing property and that any allowable deduction from income realized under contracts for its purchase should be regarded as representing the exhaustion of the cost of such contracts and depreciation of the tangible assets used in the conversion process. The Commissioner acquiesced in that decision and no appeal was taken therefrom by either party. In *Signal Gasoline Corp.*, 25 B.T.A. 861, the petitioner claimed depletion deductions from income realized under casing head gas contracts in the amount of 27½ percent of the gross income therefrom. Our decision was adverse to the taxpayer, on the theory that a contract to buy casing head gas is no more than an agreement to purchase personal property as and when delivered by the producer and that the owner of such a contract therefore has no depletable interest in oil and gas property. Upon appeal to the United States Circuit Court of Appeals for the Ninth Circuit, that tribunal, in *Signal Gasoline Corp.* v. *Commissioner*, 66 Fed. (2d) 886, reversed this Board upon the authority of *Palmer* v. *Bender*, 287 U.S. 551, and held that the owner of a contract to buy casing head gas has a depletable interest in the producing property.

In this proceeding there is no question as to the petitioner's right to depletion deductions from the income realized in the recovery of casing head gas from the reserves thereof which it owns. The computation of such allowance must be made under the provisions of section 204 (c) (2) of the Revenue Act of 1926 and must give full effect to the restrictions which Congress included therein, presumably for the purpose of preserving some meaning for the word

" reasonableness " used in section 214 (a) (9) of the same act. Such restrictions are (1) that the basis to which the percentage is to be applied must be gross income from the property; (2) the deduction must not exceed 27½ percent of such basis; (3) that it must not be in excess of 50 percent of the net income from the property computed without allowance of any depletion; and (4) that it must in no case be less than it would be if computed without reference to section 204 (c) (2) of the Revenue Act of 1926.

The petitioner contends that the gross income from its casing head gas operations is the total amount of its receipts from sales of gasoline produced in its processing plant, and is the basis to which 27½ percent should be applied in the first step in the computation of the depletion allowances to which it is entitled. It relies largely on the testimony of the witness, White, which, reduced to its simplest form, is that the output of an oil well contains casing head gasoline and that processing the wet gas is no more than a mere separation and should not be regarded as a processing or manufacturing operation. He likens what he calls separation to the washing of crude oil for the purpose of removing water, dirt, and other foreign substances from the natural product and from such analogy argues that nothing new results from the processing of the wet gas into commercial gasoline.

The argument of petitioner's counsel is quite plausible, but far from convincing. He might as well contend that if the depletion in question related to an iron mine, the owner of which operated his own smelting plant for the conversion of iron ore worth only a fraction of a cent a pound, into pig iron, worth much more, he would have the right to include his total sales of pig iron in computing gross income from the mine. If the same man owned and operated the facilities for converting pig iron into watch springs worth something like $17,000 per pound, by the same process of reasoning the sale of the finished product should be included in the gross income of the mine. Or, in this case, if in addition to its plant for processing wet gasoline the petitioner owned and operated all the necessary facilities for extracting gasoline, kerosene, and the multitude of other by-products from crude oil, he would argue that the combined receipts from the sale of all the petroleum derivatives should be included in computing gross income produced from its oil and gas properties. In each of these illustrations the finished product is in the raw material and the process of conversion is a change in form which involves the creation of nothing new. If the reasoning of counsel is carried to its logical conclusion, it means that no one using raw material produced from his own property is a manufacturer unless he creates a new natural element, a power which is commonly ascribed only to Omnipotence. If the contention of the petitioner is

sustained, it is reasonable to assume that the hitherto separate activities of producing oil and gas, on the one hand, and the conversion thereof into finished products, on the other, will be merged by the entrance of all producers into the business of refining and processing of crude oil into finished commercial commodities, with the effect of indefinitely enlarging the basis for computing depletion deductions in the oil industry.

The extraction of casing head gasoline from wet gas may be a relatively simple process, but in our opinion it is, nevertheless, the conversion of raw material into a finished product and is manufacturing as that term is ordinarily understood. It requires a substantial investment in plant and equipment not in any way necessary to the production of oil and gas from the ground, as well as employment of much additional skilled and common labor. In *New Orleans* v. *Ernest*, 35 La. Ann. 746, it was held that millers who clean rice and prepare it for the market are manufacturers. The books are replete with decisions as to what constitutes manufacturing, which has been held to include such simple operations as the recovery of salt from water by evaporation, *Salt Co.* v. *Guthrie*, 35 Ohio St. 666; refining sugar, *State* v. *American Sugar Refining Co.* 108 La. Ann. 603; 32 So. 965; dyeing and bleaching cloth, *Johnson* v. *Bleaching Co.*, 15 Gray, 216; drying and splitting kindling wood, *People* v. *Roberts*, 47 N.Y.S. 122; oil refining, *Haws* v. *Petroleum Co.*, 101 Mass. 305; pork packing, *Engle* v. *Sohm*, 41 Ohio St. 691; splitting rough staves by hand, *United States* v. *Ormsby*, 4 Wall. 408; *In re Chandler*, Fed. Cases No. 2591. We conclude, therefore, that total gross receipts from the sale of casing head gasoline are income from manufacturing operations and that the fair market value of the wet gas at the well is the only part thereof that can be properly regarded as an element of the gross income from the petitioner's oil and gas properties. *Musselman* v. *Magnolia Petroleum Co.*, 231 Pac. 526; *Pautler* v. *Franchot*, 235 Pac. 209; *Rains* v. *Kentucky* Oil Co., 255 S.W. 121; *Livingston Oil Corp.* v. *Waggoner*, 273 S.W. 903.

In the circumstances herein the gasoline which the petitioner sells is produced in its processing plant from wet gas as a raw material. No part of that plant is property from which a natural resource is recovered. A very considerable percentage of the sales price of the commercial gasoline results from operations within the plant. It is obvious, therefore, that much of the alleged basis for depletion in fact flows from the use of physical assets in a trade or business. That petitioner is entitled to depreciation deductions thereon is not open to question. It would appear, therefore, that the present claim for additional depletion allowances is one for increased depreciation deductions. The record shows that petitioner's claims for additional depreciation have been settled by stipulation and are no longer at issue.

Petitioner contends that, as the owner of the property from which the wet gas is produced and of the plant in which such product is converted into commercial gasoline, it is in a stronger position than one who takes the natural product under a contract and converts the same in its separately owned and operated plant, as was the case in *Signal Gasoline Corp., supra.* This is true only as to its right to depletion deductions based on its income from oil and gas property, which is not in question here, and has no bearing on the correct method of computing such depletion allowances in conformity with section 204 (c) (2) of the Revenue Act of 1926, which is the only issue now under consideration. In the *Signal Gasoline Corp.* case the court did not compute the allowance to which it held the taxpayer was entitled, nor even suggest a formula or rule for such computation. That case, therefore, established no rule governing the present controversy, which relates solely to the gross income realized from petitioner's oil and gas producing property.

In this proceeding the respondent has determined that raw material cost of the wet gas is 40 percent of the receipts from the sale of the marketable gasoline extracted therefrom. In the absence of any proof of the actual fair market value of the petitioner's casing head gas at the mouth of the well, this determination must be affirmed and the income in question computed with due regard to the limitations in section 204 (c) (2) of the Revenue Act of 1926.

The question of depreciation has been settled by stipulation, which should be made effective in the recomputation of the deficiencies in controversy.

Reviewed by the Board.

*Decision will be entered under Rule 50.*