BOSWORTH et al. v. EASON OIL CO. et al.

No. 31375.   Oct. 4, 1949.

Rehearing Denied Jan. 17, 1950.

*213 P. 2d 548.*

Rittenhouse, Webster, Hanson & Rittenhouse, John Barry, and McGuire & McGuire, all of Oklahoma City, for plaintiffs in error.

Simons, McKnight, Simons, Mitchell & McKnight, of Enid, for defendants in error.

HALLEY, J.  This is an action for accounting and damages claimed by R. L. Bosworth and associates, plaintiffs in error, against Eason Oil Company, a corporation, defendant in error, who will be referred to herein as plaintiffs and defendant as they appeared in the trial court.

Henry G. Katschor and others owned 80 acres of land in Logan county, Okla., and in 1930 executed an oil and gas lease thereon, containing the usual provisions relative to 1/8 royalty to lessors of oil, $50 per annum, for each well where gas only was produced, and 1/8 of the market value of the gas produced from any oil well and used for the manufacture of gasoline or other product, or sold.  The royalty interest is not now involved in this suit, the claims of the landowners having been docketed as a separate action.

The issues here arise out of two contracts between the owners of the 7/8 working interest in the oil and gas lease. W. C. Currier and Frank Frantz, as the owners of the oil and gas lease mentioned, entered into an operating contract with Eason Oil Company, whereby the latter agreed to drill a test well for oil and gas, and as part of the consideration for drilling the well, the Eason Oil Company was assigned an undivided one-half interest in the 7/8 working interest in the lease. If the well was a producer, Eason Oil Company was to have complete control of the lease and its operation. Plaintiffs were to pay one-half of the operating expenses and receive one-half of the proceeds from the sale of oil and gas produced, less 1/8 royalty interest to the lessors.

The test well was drilled, and at first produced several hundred barrels of oil per day and some four or five million cubic feet of casinghead gas per day from the Layton sand, found at about 5,000 feet. Both the oil and gas came from the same sand, two or three feet in depth, at the bottom of the hole, in the form of a spray or vapor. The oil and gas were separated in the usual manner in a separator, where the crude oil settled by gravity to the bottom of the separator and then into the flow or storage tanks, while the volatile gas was vented into the air at the top of the separator. There was no casinghead gas plant in that area, and hence no market for the casinghead gas, since it cannot be used as a fuel in the form in which it comes from an oil well.

The well was brought in in October, 1930, and on April 28, 1931, the plaintiffs and the defendant entered into a second contract, on a form generally referred to as a "Casinghead Gas Contract", in which plaintiffs were referred to as "Sellers" and the defendant as "Buyer". In general terms it provided that plaintiffs agreed to sell to defendant their share of the casinghead gas produced from the well at a price arrived at by multiplying 25% of the gasoline content of the gas produced by the average selling price per gallon of gasoline sold the preceding month by defendant, where the gasoline content was two gallons or less per thousand cubic feet of gas, or by 33 1/3 per cent of the gasoline content where it reached more than two gallons per thousand cubic feet of gas. The gasoline content was to be determined by the field compression test, or, at the option of the plaintiffs, by the charcoal test. Defendant agreed to erect and operate at its own expense a casinghead gasoline plant upon the land, of the absorption type. The principal reason for this second contract was doubtless to provide a means for saving the large volume of casinghead gas being produced.

Under the lease operating contract plaintiffs were to receive their share of the oil produced, less their one-half of the operating expenses, and under the casinghead gas contract they were to receive payment as provided by the terms of the contract for their share of the casinghead gas produced, but were not burdened with any part of the cost of the plant or the expenses of its operation. Such costs were to be borne wholly by the defendant.

Plaintiffs allege that the defendant has operated fraudulently under both the lease operating contract and the casinghead gas contract. They claim that the defendant has not accounted fairly for the oil produced; has bypassed oil and not accounted therefor; has failed to account for materials and equipment used upon the lease and partly charged to plaintiffs; has failed to account for the market value of the oil produced and sold; overcharged plaintiffs for operating expenses; so operated the gasoline plant as to draw crude oil through the plant and failed to account therefor; and has greatly damaged the well as an oil well by failing to tube it, and thus shortened the life of the well, to the great loss of the plaintiffs.

This is the third appeal to this court. This case was filed in 1933 in the dis-

trict court of Logan county, and trial resulted in a judgment for the defendant. On appeal the judgment was reversed and the case remanded for a new trial (Katschor et al. v. Eason Oil Co. et al., 178 Okla. 634, 63 P. 2d 977. On the second hearing, the court sustained the motion of the defendant to quash the summons, and on appeal the ruling of the trial court was again reversed and the case remanded for further proceedings (Katschor et al. v. Eason Oil Co. et al., 185 Okla. 275, 91 P. 2d 670). The third trial was had in 1942, when judgment was rendered for the plaintiffs for $520.84 and costs, and from that judgment, plaintiffs have appealed. Grounds for reversal are set out in eight propositions, which will be considered in the order stated in plaintiff's brief.

It is first claimed that where one joint adventurer has exclusive control and management of the joint enterprise, such party stands in a fiduciary relationship to his co-adventurers and is bound to the utmost good faith in accounting to them for all money and property received, and that such accounting may be demanded even though they have accepted over a long period a portion of what they are justly entitled to receive.

The defendant does not dispute this general proposition of law, but admits that a joint adventure existed under the lease operating contract. However, it contends that such relationship does not exist under the casinghead gas contract, where it is claimed that the parties dealt with each other at arm's length, and as vendor and purchaser. It is nowhere claimed that there was any fraud practiced by either party in entering into this contract. The complaints of the plaintiffs are to the alleged wrongful acts in operations carried on by the defendant under the contracts. Whether or not the casinghead gas contract makes the parties thereto joint adventurers is a difficult question to determine. As stated in 48 C.J.S. §1a, p. 801, a certain, all-inclusive definition is very difficult, but

a joint adventure is aptly defined as "an association of persons to carry out a single business enterprise for profit". Some of the common elements of a joint adventure are lacking in the casinghead gas contract, although it is very closely connected with the operations under the oil and gas lease operating contract, wherein the parties are clearly joint adventurers. The parties do not share in the profits nor the losses under the casinghead gas contract, since the costs of the erection and operation of the plant are to be paid entirely by the defendant. However, the income to the plaintiffs from casinghead gas, as provided for in the contract, depends somewhat upon and is very closely allied to the profits accruing to the defendant in this operation. While we are of the opinion that the casinghead gas contract does not create a joint adventure, we find no necessity to apply any strict rules with regard to whether or not the duties and obligations of joint adventurers are to apply in determining the rights of the parties under this contract. Each was obligated to act in good faith in dealing with the other. This contract was entered into by both parties in an effort to secure a market for and an income from the large volume of casinghead gas being produced from the well. Plaintiffs took no risk in this respect, as did the defendant, who bore all the expense of erection and operation of the plant. Had the volume of gas being produced declined rapidly, the defendant would have suffered considerable loss, while the plaintiffs, with no outlay of cash, would have suffered only the misfortune that befalls many who take the risks incurred in the oil and gas business.

Plaintiffs say that the findings and judgment in their favor for $480, found to be due them on account of overcharges made by the defendant for services rendered in the operation of the lease, is entirely too small and inadequate. The evidence showed that the lease had been charged with $100 per month for the services of Jack

Coker, who worked part time at the gasoline plant and gave part of his time to the operation of the lease. The court found that the defendant should have charged to the lease only $60 per month for a period of two years, making a deduction of $40 per month, or $960 for twenty-four months, one-half of which, $480, was allowed to the plaintiffs. A careful reading of the testimony does not disclose that this finding is against the weight of the evidence. If this employee had not given part of his time to the plant operation, his entire salary would have been justly chargeable to the lease, since it was necessary to have an employee in charge of the lease.

Plaintiffs contend that the allowance of $40.84 for equipment charged to the lease and unaccounted for is far too small. This lease was operated over a period of about ten years. Numerous articles of equipment and supplies were necessarily used. The principal testimony on this matter was that of the witnesses Rudy and Hatton. It is impossible to determine with accuracy just what sum, if any, plaintiffs are entitled to recover under this claim. It is certain that some things were not accounted for or found, but we must bear in mind that some expendable materials were used on the lease and were either consumed, worn out and properly abandoned, or possibly stolen. The evidence is so conflicting and uncertain that we cannot say that the finding of the trial court is against the weight of the evidence.

Plaintiffs further contend that they should be accounted to for the difference between the gasoline content of the gas as shown by the field compression tests and the charcoal tests, from the beginning of operations at the plant and the date in 1933 when they exercised their option to require that charcoal tests be used. After they demanded charcoal tests, these were used exclusively. The contract of the parties on this point is as follows:

"The gasoline content of the gas, to be metered as hereinafter provided, shall be determined by a field compression test in the manner prescribed, as approved February 14, 1920, in the regulations of the United States Department of the Interior for such tests, and according to the specifications of equipment and method as set out in the Code developed and jointly approved by the Natural Gas Association of America, and the Association of Natural Gasoline Manufacturers, June 1, 1927. . . ."

The contract further provided that such tests should be made quarterly, at the expense of the Buyer, and used in computing gas settlements until the next test is made, and that Buyer should give Seller five days' notice previous to each test in order that Seller might have a representative present when the test was made.

At the close of the paragraph in which the above provisions appear, we find the following clause:

"At the option of the Seller herein, the gasoline content may be determined by charcoal test in the manner prescribed and in accordance with the specifications for apparatus and methods outlined by the Natural Gas Association in their pamphlet No. 1."

At page 229 of plaintiffs' brief, we find the following assertion:

"We are not here contending that we are entitled to more pay for casinghead gas nor the content of casinghead gas. What we are contending is that there has been a fraudulent use of the properties, and that large quantities of the more volatile parts of the crude oil which came into the separator in mist form were not allowed to settle out and were pulled through the separator wrongfully and fraudulently and that the plaintiffs in error were deprived of their crude oil by reason of this process."

The foregoing statement is somewhat confusing in view of the contentions of the plaintiffs in other sections. How-

ever, casinghead gasoline plants were numerous in the State of Oklahoma and around Oklahoma City at the time this contract was executed. There is no claim that it was not known at the time the contract was executed that the charcoal test generally gave a higher content of gasoline than did the field compression test. It is contended that since the parties were joint adventurers, and it was discovered that the charcoal test generally showed a higher gasoline content than did the compression test, the defendant owed the duty to plaintiffs to use the test which generally showed a higher gasoline content, and should pay the plaintiffs what is claimed would be due them had the charcoal test been used at all times. The contract provided for the field compression test and then gave the plaintiffs the option to request the charcoal test. They did request the charcoal test in 1933, and thereafter settlements were made as calculated under that test. These tests were all made by the same disinterested testing agency, the Oklahoma Meter and Gas Testing Company. The gasoline content as shown by the last compression test in 1933 showed a content of .42, and the first charcoal test made in July, 1933, showed a content of .475. To hold that the defendant should have experimented to discover the test that would show the higher gasoline content, and then used that method for all tests, would be modifying the contract of the parties. The field compression test is first provided for in the contract, and then, at the end of the same paragraph, it is provided that the plaintiffs have the option of requiring the charcoal test. It is well known that the content varies, and all witnesses testify that the actual recovery by an efficiently-operated plant will show a recovery above that shown by either test. The recovery is generally double that indicated by the tests, but that does not mean that the full amount so recovered can be realized upon in marketing the gasoline.

Plaintiffs allege that defendant failed to account to them for the full market value of the oil produced and sold. The one-half interest in the oil produced and sold that belonged to the defendant was sold along with the interest of the plaintiffs. It is admitted that since August, 1933, plaintiffs have been paid the highest market price for their share of the oil. When the well first came in, the Champlin Refining Company was the only purchaser of crude oil in the field and paid defendant the highest price available at the time. After the defendant completed a pipe line to the field, it began to take the crude oil, and accounted to plaintiffs for the posted market price of the major producing companies. During part of the time this well was producing, the price of crude oil was extremely low, but the evidence sustains the claim of defendant that it disposed of the crude oil at the best price obtainable in the field.

Plaintiffs next contend that they are entitled to recover a large sum for crude oil produced and by-passed and not accounted for, and that the well and plant were so operated as to pass large quantities of crude oil through the plant. The claim that crude oil was by-passed through pipes installed by the defendant is explained by the fact that other operators brought in oil wells before they had storage or pipe line facilities available, and that these by-pass lines were put in to enable them to receive, temporarily store, and run into the pipe lines later the crude oil produced by other operators. The evidence fails to show that plaintiffs were deprived of any crude oil by this method.

However, it was contended that the gasoline plant was so constructed and operated by the defendant as to by-pass the more volatile parts of the crude oil which were not a part of the casinghead gas. That by the unusual use of the Clark engines, crude oil suspended in the gas was drawn or

pumped from the well with such velocity that crude oil did not have time in which to settle in the separator.

There is a great deal of testimony concerning the purpose, nature and use of Clark engines. They are primarily compression engines and are constructed with a low-pressure and a high-pressure cylinder, sometimes referred to as the low side and the high side. Gas is drawn into the low side and compressed to a certain pressure, and then forced into the high side, where it is compressed by the movement of the piston to a higher pressure. Due to the unusual nature of the well, the high-pressure cylinders were removed and only the low side used in the plant. Then, in order to reduce the load on the engine used to operate the compressors, the intake and outlet valves were removed from one side of the piston, thus reducing it to a single action instead of the usual double-action piston or cylinder. This enabled them to pass through the Clark engines a much greater volume of gas, and it was admitted by Mr. Prestidge, witness for the plaintiffs, that the high sides were not needed at this plant. The whole object of the Clark engines was to compress the casinghead gas and force it through the plant with proper velocity. From the engines the gas passed through a scrubber to remove any foreign substances, and then into the absorption unit which contained mineral seal oil which absorbed the more volatile elements and carried them to the stills where the casinghead gasoline was removed from the mineral seal oil.

It was testified by the witness Prestidge that he was instructed by those over him at the plant to slow down the Clark engines when a test of the gasoline content was to be made, in order to show a lower content, but this testimony is flatly denied by the witnesses who supervised the plant operations. Mr. Prestidge had been discharged as a plant employee and then accepted employment by the plaintiffs, and was to be paid a portion of any recovery by plaintiffs. It is undisputed that crude oil, as such, cannot be passed through a Clark compressor engine, because it is not compressible. One witness stated that a half pint of fluid would blow the head off a Clark cylinder. The more volatile parts, such as propane and butane, were some of the principal elements of casinghead gas.

Some stress is laid upon the admission by the defendants that the Clark engines, as used at this plant, are in fact pumps. We are unable to find any particular significance in this statement. A compression engine must suck, draw or pump the gas into the cylinders through intake valves and then compress it to the desired pressure and force it out through outlet valves with sufficient velocity or pressure to force it through the plant. Emphasis is placed upon the fact that the well is only 150 feet from the gasoline plant. The evidence fails to disclose any ulterior motive in locating the plant close to the well. It probably saved some expense in connecting the well with the plant, but we fail to find any material advantage to the defendant or disadvantage to the plaintiffs in so locating the plant. The evidence shows that all of the equipment used at the plant was of standard make. There was a separator, regulator for maintaining an even back pressure on the well, scrubber to remove any foreign matter from the gas before it entered the compressors, Clark engines, absorber tank, and stills for the production of casinghead gasoline in the usual manner. If the casinghead gasoline contract proved to be a lucrative venture for the defendant and of little value to the plaintiffs, this fact would not justify any modification of the contract of the parties by this court.

The case of Mussellem et al. v. Magnolia Petroleum Company et al., 107 Okla. 183, 231 P. 526, is cited by both parties. It was decided by this court in 1924, and contains a very complete discussion of the term "casinghead

gas", and also "gas produced from an oil well". It holds that where a lease contract provides that lessors shall pay to lessees the sum of $50 per annum for gas produced from each oil well, and used off the premises, such payments satisfy any and all claims due the lessors for such gas. Lessors claimed that the lessees had been producing and selling large quantities of commercial gasoline without accounting to lessors therefor.

In Hammett Oil Co. v. Gypsy Oil Co., 95 Okla. 235, 218 P. 501, this court held that casinghead gas is not gas simply or oil simply, and that where a lease provides for royalty on oil and on gas produced from a well where gas only is found, it does not cover casinghead gas, and that the parties had not contracted with respect thereto. It will be noted that both in the oil and gas lease and in the casinghead gas contract between the parties to this action, casinghead gas, or gas produced from an oil well, is expressly provided for, and in the absence of fraud or mistake must be presumed to have been understood by the parties to these contracts.

In Magnolia Petroleum Co. v. Connellee (Tex. Com. App.) 11 S.W. 2d 158, the Supreme Court of Texas had under consideration an oil and gas lease which provided for a 1/8 royalty on oil produced, $200 per annum for gas from a well producing gas only, and $25 per annum for each well producing casinghead gas, where sold or used off the premises. In the body of the opinion, the court said:

"The contract made by these parties is too clear, plain and unambiguous, to be misunderstood. It is open to but one construction. It was clearly recognized by this contract that from an oil well brought in on the premises there would be produced casinghead gas, and it was specifically provided what compensation the lessors should receive therefor. This court is asked to hold that because casinghead gas is shown to be the result of a separation of the lighter or volatile part of the oil that it should be paid for as oil, when the parties have expressly contracted and agreed that it should be paid for in a particular way as casinghead gas. To so hold would require that this court write into the contract language which the parties themselves did not place there. We would be compelled to make for the parties a new and different contract."

The court further stated that it should not alter or modify the contract between the parties, "even though subsequent developments have made the same an extremely profitable one for the lessees." See, also, Hopkins v. Texas Company, 10 Cir., 62 Fed. 2d 691.

It is contended that the well involved was so mismanaged and inefficiently operated by defendant that its life as an oil well was shortened and its production of oil reduced to the extent that it was damaged in the sum of $40,000, one-half of which should be credited to plaintiffs. The testimony offered in support of this proposition is not convincing. The witness E. D. Parker testified that he had made an examination or inspection of the well some three weeks before he testified, and that in his opinion the well should have been tubed from the beginning, since it probably contained a fluid level up to 2,000 feet from the top of the casing. He further stated that his testimony was based upon his experience in gas lift in oil and gas wells, but that he had never tested or measured the well, and had never seen it opened up and flowing, but could judge its condition by listening to its flow of casinghead gas into the separator. Other witnesses who tested the well testified that there was no fluid level in the well until 1936, when it began to flow by heads, and that it was then tubed. The witness Jack Coker stated that tubing the well increased its oil production in a negligible amount for a short time only. Mr. Parker stated that if the well had been tubed it would have produced a much larger amount of oil, but a smaller volume of casinghead gas, containing a larger gasoline content. If tubing the well would have increased the crude oil production but

decreased the volume of casinghead gas, it follows that the income of plaintiffs from crude oil would have been increased and their income from gas decreased. But there is apparently no effort to even estimate the difference in total income from the well, if tubing for the raising of crude oil had been used during the entire life of the well. The life of the well was slightly more than ten years. No other well in the vicinity appears to have been drilled to the Layton sand at or near the time this well was completed, and we have no yardstick with which to measure accurately the proper life of this well as a producer of oil and casinghead gas. It is well known that the life of oil wells varies greatly, and unless there are other wells producing from the same sand in the immediate vicinity, it is difficult to estimate whether or not the life of a well has been shortened by improper operations by its producer.

The evidence relative to damage to the well is so uncertain that we cannot find that the finding of the trial court is against the weight of the evidence.

The trial court awarded to the plaintiffs a judgment for $520.84, and adjudged the costs against them. In LeCompte v. Jones, 136 Okla. 1, 275 P. 634, this court had before it the question of proper taxing of costs in an equity proceeding, and in the second syllabus expressed the rule in this state as follows:

"In equity proceedings, such as actions for accounting and injunction, the trial court is vested with discretionary power, by virtue of sec. 773, C.O.S. 1921 (Title 12, sec. 930, O.S. 1941) to apportion and tax costs as it may think right and proper, and the action of such court in so doing will not be disturbed on appeal, unless it clearly appears that the court has abused its discretion."

We have here an equity action for accounting for approximately $200,000, and on the third trial plaintiffs were given a judgment for slightly more than $500. When we consider the entire record of this case, which originally included an action for injunction, we are unable to find that the trial court abused its discretion in taxing the costs against the plaintiffs.

This court has held in many cases that in an equitable action it will review the entire record and will not disturb the findings and judgment of the trial court unless they are found to be against the clear weight of the evidence. Clayton v. Speakman, 182 Okla. 86, 76 P. 2d 376; Payne v. Wade, 190 Okla. 222, 122 P. 2d 144. A careful review of the voluminous record herein convinces us that the findings and judgment of the trial court are not against the clear weight of the evidence.

The judgment is therefore affirmed.

DAVISON, C.J., and GIBSON, LUTTRELL, JOHNSON, and O'NEAL, JJ., concur. CORN and WELCH, JJ., dissent.