JOHNDROW et ux. v.
JOHNDROW et al.

No. 32922.    Oct. 21, 1947.

Rehearing Denied Nov. 10, 1947.

*186 P. 2d 325.*

J. E. Falkenberg and Phil O'Neill, both of Enid, for plaintiffs in error.

Elam, Crowley & Musser, of Enid, for defendants in error, Edward A. Johndrow, Nelson W. Johndrow, Philip A. Johndrow, Virginia Welty, Julian C. Johndrow and Leo L. Johndrow.

L. W. McKnight, of Enid, for defendants in error, Frank B. Murta, Wesley M. Smith and Investor's Royalty Co., Inc.

LUTTRELL, J.   This is an action to quiet title brought by plaintiffs, Thomas A. Johndrow and Carrie E. Johndrow, against the defendants, Edward A. Johndrow, Nelson W. Johndrow, Philip A. Johndrow, Virginia Welty, nee Johndrow, Julian C. Johndrow, Leo L. Johndrow, Frank B. Murta, Wesley M. Smith, and Investor's Royalty Company, Inc. The defendants, by answer and cross-petition, asserted their title to certain mineral interests under the land claimed by plaintiffs, admitting the title of

plaintiffs to the surface, and one-seventh of the mineral interest, but claiming ownership of the remaining six-sevenths. The case was tried to the court without a jury. The court found for defendants, and rendered judgment decreeing them to be the owners of six-sevenths of the mineral interest under the land of plaintiffs. From that judgment, plaintiffs appeal.

Undisputed facts are that Albert Johndrow and Mary Johndrow were the parents of the plaintiff, Thomas A. Johndrow, and of all the individual defendants except Frank B. Murta and Wesley M. Smith; that Albert Johndrow died on January 3, 1939, leaving a last will and testament, in which Thomas and Nelson W. Johndrow were named executors; that the will was duly probated and that throughout the probate proceeding the northwest quarter of section 36, township 24 north, range 5 west, in Garfield County, the property involved in this action, was listed as the property of Albert Johndrow; that Thomas joined in the petition for the probate of the will, signed the inventory and other papers filed during the progress of the case, joined in the final report, and in connection with the final report petitioned the county court of Garfield county for a construction of the sixth paragraph of the will, and that the property of the deceased, including the property above described, was distributed to the heirs subject to a life estate of Mary Johndrow, the widow, and in accordance with the county court's construction of said paragraph 6. Said paragraph 6 of the will reads as follows:

"Sixth: It is my further wish, and it is so ordered, that any bonus received for oil leases or from royalties or income from oil and gas wells shall be equally divided between all of my seven children regardless as to which piece of land this revenue is derived from or acquired."

In accordance with the provisions of the will as construed by the county court, the land above described was distributed to Thomas, subject to the rights of the seven surviving children of decedent "to share equally in any bonus received for oil leases, or from royalties from oil and gas wells, or either of them". The various tracts of land which, by the terms of the will, were left to the other six heirs of Albert Johndrow, were distributed to them in the same manner, and subject to the rights of all to share in the oil and gas as above set forth. Thus, in effect, each heir received an undivided one-seventh interest in the bonus, royalty, and other income from the oil and gas mining rights under all the lands of the testator, the title to the surface being vested in them severally in accordance with the terms of the will, and all being subject to the life estate of the widow.

It appears that prior to the death of Albert Johndrow, he made deeds conveying to his various children the tracts of land which he devised to them by the will; that all the deeds and the will were executed on October 11, 1937; that the land above described was in process of purchase by him from the Commissioners of the Land Office of the State, and was not fully paid out at the time of his death, and that the deed made by him to Thomas was a quitclaim deed, and that he also made an assignment of his certificate of purchase issued by the Commissioners of the Land Office. None of these deeds were delivered to the Johndrow children during the lifetime of Albert Johndrow or of Mary Johndrow, his wife, unless the evidence hereinafter set forth is sufficient to show delivery to Thomas of the quitclaim deed and certificate of purchase above mentioned.

Plaintiffs' claim of title to the entire mineral interest under the land involved is bottomed upon their assertion that Albert Johndrow, during his lifetime, delivered the quitclaim deed and assignment above mentioned to Thomas, thus vesting in Thomas a title to all the minerals under the land involved herein which was unaffected by the will.

To sustain this contention Thomas testified that he had been renting the land hereinabove described from his father ever since 1908; that in 1917 his father agreed to sell him the land just like he, (the father) was buying it from the School Land Department; that under said agreement Thomas was to continue to occupy the property, paying one-third of the farm products as rent, and Albert Johndrow was to continue to make payments to School Land Department, and to pay the taxes, but that Thomas was to pay for all upkeep or improvements from that time on; that if Albert Johndrow saw that he was not going to live until the final patent from the School Land Department was issued, he would make Thomas a quit-claim deed and assignment, and that in case he died prior to receiving the patent Mary Johndrow would continue to make the payments and get the rental during her lifetime. Thomas testified that he carried out the terms of this agreement, and that he placed improvements on the property costing approximately $2,500. He enumerated improvements costing in the vicinity of three or four hundred dollars, but testified that there were other improvements in addition to those, and that he and his wife occupied the place as their homestead.

The evidence is undisputed, and Thomas admits, that after the agreement of 1917 between him and Albert Johndrow, he continued to pay rent to Albert Johndrow up until the time of his death, and thereafter to Mary Johndrow, and that Albert Johndrow and Mary Johndrow made the payments to the School Land Department, and paid taxes on the land, except one payment of taxes which Thomas testified he made because his father did not have the money. The record also shows that Albert Johndrow and Mary Johndrow leased the land for oil and gas on August 14, 1925, and again on January 6, 1936, and that none of the money received as bonus or rentals for these leases was turned over to Thomas or his wife.

As to the delivery of the deed and certificate of purchase, Thomas testified that his father was sick, and that on the 1st day of March, 1938, both the plaintiffs, who are husband and wife, went to his father's residence and spent the day there; that his father had his mother bring him a tin box which contained his papers, and that his father opened the box and taking a paper therefrom stated that he had made out a will. Thomas then testified as follows:

"A. And he handed this will to me and I read it. After I had read it, I started to hand it back to my father, and he says, 'Let Carrie read it'. Q. (By Mr. Falkenberg): Who is Carrie? A. Carrie is my wife. So she took it, and about the same time he reached in this box and he gets out these papers —this quitclaim deed and the assignment or transfer, and handed them to me and he said, 'Here is the papers to your place'. Well, as soon as he done that, I figured that the deal between—from 1917 until that time was finished, with the exception—Mr. McKnight: We object to this conclusion as to—The Court: Objection sustained to his conclusion. A. Well, it had completed the deal between my father and I up until that time. Q. (By Mr. Falkenberg): All right; what else was said, if anything? A. Well, when my wife got through reading the will, she handed it to me and I handed it to my father, and in turn—no, I handed it to my mother—that is the way it was; and he handed her the box, and about that time I handed my papers over there to my mother, and I said, 'You look after them;' and he says, 'Now, if anything happens,' he says, 'be sure and get this stuff on record' Q. Was that prior to the time you gave her your deed? A. Yes, sir, that was prior to that time. Q. When he gave her the will and the box, you gave her your papers to keep for you? A. Yes, sir."

The testimony of Carrie Johndrow is to the same effect. Thomas testified that after his father's death his mother brought the box to the home of his brother Edward, where all the family were assembled, and that the envelope

in which the will and the various deeds was contained was found in the box unsealed; that there was a typewritten notation on the envelope, as follows:

"To whom this may concern:

"This envelope, containing valuable papers, is not to be opened until after the death of the undersigned. Albert Johndrow, and his wife, Mary Johndrow, or the survivor thereof.

"And, after said last event, then the papers contained herein shall be delivered to Thomas A. Johndrow and Nelson W. Johndrow, or either of them.

"Dated, this the 11th day of October, 1937.

"(Signed) Albert Johndrow."

That thereupon, with the approval of all members of the family, his brother Nelson sealed the envelope and returned it to the box, and that a few days later he and Nelson Johndrow, at the request of his mother, rented a box in the Central National Bank at Enid, and deposited the tin box with the papers in the bank.

It is undisputed that this box containing the papers remained in the bank until, at the request of the county judge, it was removed and the papers taken to the office of the county judge by Thomas and Nelson Johndrow, where it was opened and the will was taken from the envelope and filed for probate. The box, with the deeds still in it, was taken to the home of Mary Johndrow, where it remained until after the will was probated and the estate of Albert Johndrow distributed, and after the decree of distribution of the estate had been recorded Nelson Johndrow distributed to the children the various deeds contained in the tin box.

So far as the record shows Thomas made no claim to any person that his father had delivered the deed and certificate of purchase to him, and made no claim of title thereunder, until this action was commenced. He testified that he tried to talk to the attorney who pro-bated the will about them, but that said attorney would not listen to him. The attorney testified that he advised the parties that the deeds were valueless, and that it would be necessary to probate the will. This advice was given on the same day that the will was produced in the office of the county judge.

Several of Thomas A. Johndrow's brothers and sisters testified that after the estate was distributed he talked to them with reference to exchanging their mineral or royalty rights under his land for the mineral or royalty rights which he received under the terms of the will, for the reason, as stated by him, that he wanted to get all the title to his land in him if he could, but that no such trades were made.

The decree of distribution in the estate of Albert Johndrow, deceased, was entered on January 11, 1940. The record shows that on March 14, 1945, Thomas and Carrie Johndrow leased the land in controversy to the Atlantic Refining Company; that at the time said lease was made the lessee apparently had made no examination of the title, and that Thomas advised the party taking the lease that if it was not good he would make another lease if they required one; that thereafter the representative of the lessee advised him that it would be necessary that a new lease be executed in which all the children of Albert Johndrow join as lessors, and such lease was executed on May 10, 1945. That lease provided that all bonuses and rental money should be deposited to the credit of Thomas for distribution to all of the lessors in equal proportion, and he testified that he so distributed the bonus paid for the execution of the lease.

Plaintiffs contend that their testimony as to the purchase of the land in 1917 was uncontroverted, and that their testimony as to the delivery of the deed and assignment as above set forth is likewise uncontroverted, and is suffi-

cient to establish an unconditional delivery of said instruments to Thomas in order to carry out the 1917 agreement; that the subsequent return of the deed and assignment by Thomas to his mother was not a return of the deed to his father, but a deposit with his mother for safekeeping, and that he could have demanded and received the instruments at any time.

We do not agree that this interpretation of the circumstances in connection with the alleged delivery of the instruments to Thomas is the only reasonable interpretation which may be placed upon the testimony of plaintiffs.

The agreement in 1917 for the purchase of the land by Thomas, and the method in which the agreement was carried out was, to say the least, unusual, and the conduct of the parties thereafter, as outlined above, was inconsistent with the existence of such an agreement. But, if we assume that the agreement was made as testified to by Thomas, and that the testimony of Thomas and his wife as to the delivery of the deed correctly delineated that transaction, we are still of the opinion that the testimony as to the delivery of the deed and assignment of certificate of purchase supports the finding of the trial court that it was a delivery for inspection only, and not an absolute and unconditional delivery with intent to pass title.

In Kelsa v. Graves (Kan.) 68 P. 607; Seifert v Seifert (Kan.) 71 P. 271; Johnson v. Craig, 37 Okla. 378, 130 P. 581; McClintick, Adm'r, v. Ellis, 87 Okla. 75, 209 P. 403, and other cases cited and relied upon by plaintiffs, the evidence established a delivery by the grantors of the conveyances therein involved, either to the grantee or to a third person, so that the conveyance was placed beyond the control of the grantor, thus establishing with reasonable certainty that the grantor intended to divest himself of title.

In Smith v. Dolman (Kan.) 243 P. 323, cited by plaintiffs, the deed was delivered to the grantee and by her placed in a part of a safe used by her, and kept separate and apart from her father's papers.

In Snodgrass v. Snodgrass 107 Okla. 140, 231 P. 237, we said:

"To be effective after the grantor's death, the deed must have been executed by the grantor in the form and manner required by law for the execution of deeds, and in the lifetime of the grantor he, the said grantor, must have caused such deed and the title to such real estate to have passed completely beyond his power and control, and have caused the title to same to pass into the control of the grantee, although the document itself may have been reposed in the hands of some third party, and a life estate reserved to the grantor."

The governing principle is concisely stated in 16 Am. Jur. p. 503, section 117, as follows:

"The intent of the grantor is the paramount consideration on the question of the delivery of a deed. A delivery which will pass title occurs only when the grantor parts with his dominion over the deed with the intention to pass title."

In the instant case the evidence shows that the deed and assignment remained in the box and under the control of Albert Johndrow up to the time of his death. There was no attempt, so far as the record shows, to segregate it from his other papers, and when the envelope, sealed after his death, was finally opened, the will and the deeds to the other children reposed in the same receptacle with the quitclaim deed and assignment.

In Anderson v. Mauk 179 Okla. 640, 67 P. 2d 429, we announced the rule that where the instructions which accompanied the delivery of a deed to a third party were not definite and unequivocal, the subsequent acts and con-

duct of the grantor were entitled to serious consideration in arriving at the grantor's intent. We there said:

"In such cases, the subsequent conduct and declarations of the grantor claim an important degree of consideration from an evidentiary standpoint, not because the grantor has the right by a change of intention to alter the effect of the previous delivery, but because his subsequent acts and declarations may by reflection shed some light upon his previous intention at the time the deed was delivered. This important bearing of the subsequent acts and declarations of a grantor was overlooked by us in the case of Kay et al. v. Walling, supra, but it was carefully noted by the Court of Appeals of New York in the case of Saltzsieder 114 N.E. 856."

The same rule may properly be applied where, as here, the evidence as to delivery does not clearly and unequivocally disclose the intent of the grantor unconditionally to deliver the deed for the purpose of vesting the grantee with title. In the instant case, so far as the record shows, the grantor continued to exercise all the rights of ownership over the property; such as paying the taxes, listing the property for taxation in his name; making the payments to the School Land Department, and continuing to collect rents from the grantee.

The conduct of the grantee also is wholly inconsistent with any assertion of ownership by him. While he testified that he disregarded the condition in the will that he was to finish making payments to the School Land Department for the reason that he did not care anything about the will, but was going by the contract between him and his father, he at no time in any manner asserted any rights as owner of the property, but joined in the petition for the probate of the will, acted as executor of the will, and in all the probate proceedings recognized the ownership of the property by his father. Even after the will was probated and the estate was distributed, he did not assert title under the deed and assignment, but

sought to trade his interest in the lands received by his brothers and sisters for the interest they received in his land under the will. Thus it appears that the acts and conduct of both the grantor and grantee not only did not tend to prove delivery of the deed and ownership in the grantee, but negatived such delivery of ownership.

When in addition to the above, it was also shown that upon the death of the grantor the deed and assignment of certificate of purchase were found in his possession, it is evident that the finding of the trial court that the deed and assignment of the certificate were not delivered with intent to vest title in the grantee, and that the deeds were void as an attempted testamentary disposition of the property under the rule announced in Snodgrass v. Snodgrass, supra, was not clearly against the weight of the evidence. It follows that the judgment of the trial court in this respect must be sustained.

Plaintiff makes the further contention that paragraph 6 of the will, above quoted, did not vest any interest in the land, or in any land owned by the testator, in the respective devisees, and that that paragraph was insufficient to establish a trust. We do not agree. Giving paragraph 6 a fair and reasonable interpretation, we are of opinion that it vested in the various devisees an interest in the oil and gas under the lands in the nature of an equitable estate, although the legal title to the land might be vested in the children of the testator to whom it was devised. This would result in a trust in favor of the devisees of the mineral interests. Seran v. Davis, 174 Okla. 433, 50 P. 2d 662.

In Pauly v. Pauly, 198 Okla. 156, 176 P. 2d 491, we held that where in such a trust the trustees disavowed and repudiated the trust, the cestui que trust was entitled to have his interest in the property conveyed to him outright. The same rule applies here, and the trial court properly held that the respective

devisees were vested with both the legal and equitable title in their respective portions of the minerals under such lands, and that the grantees of those devisees who had theretofore disposed of a portion of their interest in the minerals under the lands of plaintiffs were likewise vested with title. This was consonant with justice and equity.

Affirmed.

HURST, C.J., DAVISON, V.C.J., and RILEY, BAYLESS, WELCH, CORN, and GIBSON, JJ., concur.