FRENCH et al. v. AYRES.

No. 33311. May 3, 1949.

Rehearing Denied June 14, 1949.

*207 P. 2d 308.*

Welch & Welch, of Madill, for plaintiffs in error.

Ezra Dyer, of Ardmore, for defendant in error.

ARNOLD, V. C. J. This is an appeal by Mary Byrd French et al. from a judgment of the district court of Marshall county quieting title to certain lands in Earl E. Ayres.

In 1923, Oklahoma Pipe Line, an Oklahoma corporation, constructed a pipe line through Marshall county and desired to acquire the lands here involved as a site for an oil pump station and to this end commenced an action in the district court of Marshall county to condemn these lands, which resulted in the appointment of commissioners as required by law whose report was duly returned to the office of the court clerk and thereafter recorded in the county clerk's office in the records relating to real estate. The Oklahoma Pipe Line thereafter constructed upon said premises its pumping station together with necessary buildings and equipment for the proper operation of its pipe line. The land thus condemned and here involved is described by metes and bounds and embraces 38.725 acres.

For a long period of time prior to 1923 the land here involved, together with other lands aggregating about 3,-000 acres, was owned jointly by two brothers, W. N. and D. B. Taliaferro, who were engaged in stock raising, but their occupancy and use of these lands was in severalty and the lands here involved were in that portion of the common holding which was occupied and used by D. B. Taliaferro. W. N. Taliaferro died in 1919 and D. B. Taliaferro in 1927. In 1936 the Pipe Line Company abandoned this pipe line and pumping station and removed from the lands here involved all usable material leaving thereon only one dwelling house which is now owned by the husband of Mary Byrd French and no question as to the ownership of this dwelling is involved.

After this abandonment the Pipe Line Company, in 1937, through one of its agents and servants, obtained a quitclaim deed to the property here involved from the heirs of W. N. Taliaferro, deceased, but with the understanding and agreement that said deed should not take effect as a conveyance unless and until all of the other heirs jointly interested in the property signed the same. This was not done, but in some manner unexplained in the record the names of the heirs who did not sign were erased in the face of the instrument by drawing a line through their names and the deed as thus altered was recorded. Oklahoma Pipe Line conveyed these lands by quitclaim deed to Clyde Lewis and by mesne conveyances whatever right and title Lewis had acquired passed to and became vested in defendant, Earl E. Ayres. Subsequent to the abandonment of its pumping site by Oklahoma Pipe Line the two groups of heirs divided all of the lands belonging to the estates of W. N. & D. B. Taliaferro, the lands here involved going to the heirs of D. B. Taliaferro with an undivided one-half interest in the minerals in and under their lands, and by subsequent partition proceedings the particular tract of land here involved was awarded to and became the property of Mary Byrd French, who is now in possession thereof and living with her husband in the dwelling house which he purchased.

Herein, Mary Byrd French and her coappellants will be referred to as plaintiffs and Earl E. Ayres as defendant.

For reversal of the judgment, plaintiffs rely upon two propositions, the first of which reads:

"The Oklahoma Pipe Line acquired an easement only by its action in eminent domain; the defendants in the condemnation suit continued to own legal title subject to the easement, and upon termination of use by the ease-

ment holder all its rights were extinguished."

Plaintiffs and defendant each invoke the provisions of 52 O. S. 1941 §60, in support of their respective contentions, but differ in their interpretation of the legal effect of the language used. That section reads:

"Any oil pipe line company, organized under the laws of this State, shall have power to exercise the right of domain in like manner as railroad companies, for the purpose of securing rights of way and sites for pumping stations, storage tanks, and depots."

Plaintiffs contend that the phrase, "in like manner as railroads," refers only to the method of procedure to be followed in condemning land, while defendant, as we understand his argument, contends that the quoted phrase embraces the quantum and quality of the estate condemned. We are impelled to the view that the contention of plaintiffs in this respect is correct for the following reasons.

The statute above quoted, when originally enacted, was not sui generis but was part and parcel of chapter 20, art. 1, S. L. 1907-08, and appeared as section 2 thereof. Section 1 of that Act prescribed the method of procedure to be followed by railroads in the condemnation of private property, and its provisions, except the last proviso, are now embraced in 66 O. S. 1941 §§53 to 56, inclusive. The language of the last proviso of that section was re-enacted and became a part of section 1, ch. 24, S. L. 1929, and now appears as 66 O. S. 1941 §57. Section 3 of the original Act related to water power companies and conferred upon them the power of eminent domain, while section 4 conferred like powers upon county, city, township, and other local officials, and section 5 gave such powers to persons or legal entities for private ways of necessity or for agricultural, mining and sanitary purposes. In each and every section of that Act, beginning with section 2, the phrase, "in like manner as railroads," was.

used. By the last proviso of section 1 of that Act, it is provided "that the provisions of this Act shall apply to all corporations having the right of eminent domain. In all cases of condemnation of private property, for either public or private use, the determination of the character of the use shall be a judicial question and the procedure shall be as provided herein." Sections 3, 4, and 5 of the 1907-08 Act now appear as 27 O. S. 1941 §§4, 5, and 6. The title of the original Act reads:

"An act amending Section 28 of Article 9 of Chapter 17 of the Statutes of Oklahoma, 1893, and regulating the method of procedure in the condemnation of private property for both public and private use."

It seems clearly apparent from this analysis of the original Act, when the title of the Act and the last proviso of section 1 are considered in their relation to the phrase, "in like manner as railroads," appearing in each of the succeeding sections, that the language of the quoted phrase relates solely to the method of procedure to be followed and does not connote the quantum or quality of the estate to be acquired by condemnation.

Upon the trial of this case the record of the condemnation proceedings had in the same court in 1923 and relied upon by defendant were introduced in evidence and defendant contends that certain language in the petition for the appointment of commissioners, in the order appointing commissioners and in the report of the commissioners, indicates clearly that the proceeding was instituted and carried through for the purpose of condemning the fee estate in the land. Unless the Constitution and statutes authorized the taking of the fee in that proceeding, it is clear that no language appearing in the record of that proceeding could enlarge or extend the authority of Oklahoma Pipe Line beyond the limits prescribed by law. There was no judicial determination that the fee estate in the land was condemned because nothing was pre-

sented to the court in that proceeding which required judicial determination of any issue of law or fact. This occurs only when objections are filed to the report of commissioners. In the case of State ex rel. Dabney, Atty. Gen., v. Johnson, District Judge, 122 Okla. 241, 254 P. 61, this court said:

"We reach the conclusion, therefore, that where the petition calling for the appointment of commissioners reasonably conforms to the provisions of the Constitution and statutes, as it clearly did in this case, no issue is presented calling for a judicial determination, and the functions of the court are merely ministerial."

Defendant states in his brief and this court has often announced, that pipe line companies are common carriers. They are also public service corporations as that term is defined in section 34, art. 9, Const. This renders applicable in this case the language of the third, or last, proviso of section 2, art. 22, Const., which reads:

"That no public service corporation shall hold any land, or the title thereto, in any way whatever in this state, except as the same shall be necessary for the transaction and operation of its business as such public service corporation."

This provision has been held to be separate, independent, and distinct from the other prohibitions and exceptions preceding it (Oklahoma Natural Gas. Co. v. State ex rel. Vassar, County Attorney, 187 Okla. 164, 101 P. 2d 793) and imports that a public service corporation may acquire and hold land necessary and suitable for the accomplishment of its purposes under its charter and not what it prefers. (Texas Co. v. State ex rel. Coryell, County Attorney, 198 Okla. 565, 180 P. 2d 631.) In the first cited cases the first syllabus paragraph reads:

"Section 2 of Article 22, Oklahoma Constitution, relating to corporate ownership of real estate and providing certain exceptions, but prohibiting public service corporations from holding any land or the title thereof in any way whatever in this state except as the same shall be necessary for the transaction and operation of their businesses as such public service corporations, was intended to prohibit public service corporations from holding land not necessary for the transaction and operation of such businesses, regardless of whether said land is located within or without an incorporated city or town."

There is no evidence in the record, nor is any argument advanced, to show that the possession and exclusive control of the surface of this land was not all that was necessary "for the transaction and operation of its businesses as such public service corporation." On the contrary, the record discloses that Oklahoma Pipe Line constructed a station and installed all facilities for its proper use and operation and that these continued to be used in the operation of its pipe line until it saw fit to abandon the same in 1936. At that time, it salvaged all usable material, disposed of all personal property located upon the land except one dwelling house which it later sold to Clyde Lewis. A circumstance strongly indicative that Oklahoma Pipe Line did not believe that it acquired the fee title by the condemnation proceedings in 1923 is the fact that in 1937, after its abandonment of its pipe line and pumping station, it sent an agent or servant to Marshall county in an effort to obtain a quitclaim deed to the land from the joint heirs of the two Taliaferro estates. The condemnation proceedings were full and complete and conferred on Oklahoma Pipe Line whatever right, title or interest it was legally authorized to acquire.

In support of his contention that Oklahoma Pipe Line acquired a fee estate by the condemnation proceedings, defendant cites Harn et al. v. State ex rel. Williamson, Atty. Gen., 184 Okla. 306, 87 P. 2d 127; Jones v. Oklahoma City, 192 Okla. 470, 137 P. 2d 233; Scott et al. v. Signal Oil Co., 35 Okla. 172, 128 P. 694; Lillard v. Board of Commissioners, 102 Kan. 822, 172 P. 518.

We have examined these authorities but do not find them controlling or convincing upon the question here presented. The Harn case, supra, merely determined the question of title which the state acquires by condemnation for public purposes, while the Scott case, supra, had its inception and the decision therein was controlled by the language of our territorial statute which was materially different from the language contained in 66 O. S. 1941 §§53 to 56, inclusive.

The remaining question to be determined is the legal effect of the quitclaim deed executed in October, 1937, by four of the W. N. Taliaferro heirs to Oklahoma Pipe Line purporting to convey all of their right, title and interest in the lands here involved. For the purpose of procuring this deed the company sent its agent, J. J. McAuley, to Marshall county. He brought with him a form of quitclaim deed in which the six heirs of the W. N. Taliaferro estate were named as grantors. He contacted John A. Taliaferro, one of these heirs, and after conferences and conversations the two reached an agreement that he would sign the deed if the others joined therein. Subsequently McAuley and John A. Taliaferro contacted three of the other heirs who agreed to and did sign the deed upon the same condition. The others refused to sign, and before this deed was recorded the names of those refusing to sign were stricken from the face of the deed by a line drawn through their names. There is no contradiction or dispute as to the fact that McAuley and the four heirs who signed the deed agreed to the condition in its execution as above stated. This deed, with the alteration above noted, was recorded in Marshall county in July, 1938.

It is the contention of plaintiffs that the execution and delivery of this deed to McAuley upon the agreement reached by the parties constituted an oral escrow and that its subsequent recording constituted a violation of the escrow agreement and was ineffective to convey the interests therein purported to be conveyed. Defendant contends that McAuley, being the agent of the company, was incapable of being an escrow holder and that delivery of the deed to him was delivery to his principal, the grantee.

We are not impressed with either of these contentions. Essential elements of an escrow are lacking in the relations and agreements between the agent and the heirs; neither do we believe that the agency of McAuley would render him incapable of acting as escrow holder if the essentials of an escrow had existed because his duties as ascrow holder would not be antagonistic to the interest of his principal.

Whether the undisputed facts as to the agreement under which the deed was executed constitute an oral escrow or a conditional delivery, it is clear that the intent of the grantors in the execution of the instrument, whether placed in escrow or conditionally delivered, was violated by its subsequent alteration and recording. Upon either horn of this dilemma the theory of a presently effective conveyance by the grantors is punctured. In the recent case of Johndrow et al. v. Johndrow et al., 199 Okla. 363, 186 P. 2d 325, the first paragraph of the syllabus reads:

"The intent of the grantor is the paramount consideration on the question of the delivery of a deed. A delivery which will pass title occurs only when the grantor parts with his dominion over the deed with the intention to pass title."

This court on numerous occasions has discussed the question of delivery of a deed and has repeatedly announced the rule that the question is always one of fact, and depends solely upon whether the grantor intended that the instrument in question should become operative immediately and vest title in the grantee. McCuan et al. v. Gordon et al., 44 Okla. 254, 144 P. 348; Powers et al. v. Rude et al., 14 Okla. 381, 79 P. 89; Hunter Realty Co. et al. v. Spencer et al., 21 Okla. 155, 95 P. 757; Tay-

lor v. Harkins et al., 74 Okla. 206, 178 P. 117; Jameson v. Goodwin et al., 66 Okla. 146, 170 P. 241; King v. Antrim Lbr. Co., 70 Okla. 52, 172 P. 958; Shaffer v. Smith et al., 53 Okla. 352, 156 P. 1188.

Defendant makes the further contention that by reason of the quitclaim deed from the four heirs to the Oklahoma Pipe Line being permitted to remain of record from July, 1938, to the time of his purchase from Rushing in August, 1942, plaintiffs are estopped to deny the validity thereof. This quitclaim deed from the four W. N. Taliaferro heirs to the land in question was not the only public record in Marshall county relating to the condition of this title. Those records disclosed title jointly owned by W. N. and D. B. Taliaferro to a large tract of land, including those here involved, and the probate records disclosed that both of these original owners were dead and that there were ten joint heirs to the two estates. He may not now be heard to say that he relied solely upon the record of the quitclaim deed from four of these joint heirs and was thereby induced to alter his position to his prejudice.

The judgment of the trial court is reversed and the cause remanded, with directions to enter judgment in favor of Mary Byrd French as prayed for in her petition.

DAVISON, C.J., and WELCH, CORN, JOHNSON, and O'NEAL JJ., concur. LUTTRELL and HALLEY, JJ., dissent.

No. 33585.  May 24, 1949.
Rehearing Denied June 14, 1949.