**MISSOURI–KANSAS–TEXAS
RAILROAD COMPANY,
Appellant,**

v.

**The STATE of Oklahoma and the Etsi
Pipeline Project, a Joint Venture of
Texas Eastern Slurry Transport Com-
pany, Slurco Corporation, Northern
Coal Pipeline Company and Overseas
Bechtel, Inc., Appellees.**

No. 60429.

Supreme Court of Oklahoma.

Dec. 24, 1985.

As Corrected Mar. 7, 1986.

H.D. Binns, Jr., James Bailey, Gretchen Hoover, Oklahoma Corp. Com'n, Oklahoma City, for appellant.

Mike Turpen, Atty. Gen., Oklahoma City, Andrew Wilcoxen, Muskogee, for appellee, State ex rel Okla. Corp. Comn.

Chris Rhodes, John H. Tucker, Tulsa, for appellee, ETSI.

Dickson M. Saunders, Tulsa, for Public Service Co. of Oklahoma.

Leslie Pain, Anadarko, for Western Farmers.

Robert W. Sullivan, Vinita, Gene Stipe, Oklahoma City, for Grand River Dam Authority.

SUMMERS, Justice.

This controversy is the first challenge to the application and interpretation of Oklahoma law regulating the use of eminent domain by coal slurry pipelines. 27 O.S. 1981, § 7.1 et seq.

The appellant, Missouri-Kansas-Texas Railroad Co. (MKT) is contesting the decision of the Corporation Commission to grant Appellee ETSI Pipeline Project (ETSI) a license to exercise eminent domain powers in the construction of a coal slurry pipeline, Corporation Commission Order No. 238528. The license was granted after months of hearings and discovery. The licensing was vigorously contested by the Oklahoma Railways Committee, an unincorporated association composed of Oklahoma's major railroads, of which MKT is a component part. After the license was granted, MKT filed this appeal of the Corporation Commission's order.

ETSI and the Corporation Commission have challenged MKT's standing to appeal the issuance of Commission Order No. 238528. This Court deferred a ruling on ETSI's Motion to Dismiss MKT's appeal

until all issues of this case were fully briefed. These issues are as follows:

## ISSUES

1. Whether MKT has standing to appeal the issuance of Corporation Commission Order No. 238528.

2. Whether the Corporation Commission has subject matter jurisdiction over ETSI.

3. Whether the regulation of ETSI has been pre-empted by the federal government.

4. Whether 27 O.S.1981 § 7.1, *et seq.* as regulation of coal pipelines is unconstitutional.

5. Whether the right to exercise eminent domain can be conferred under 27 O.S. 1981 § 7.1, *et seq.* upon ETSI as a joint venture.

6. Whether the evidence in the record is sufficient to support Corporation Commission Order No. 238528 under the statutory standards set forth in 27 O.S. 1981 § 7.1, *et seq.*

## I.

### DOES MKT HAVE STANDING TO APPEAL THE ISSUANCE OF CORPORATION COMMISSION ORDER NO. 238528?

Whether a party has a right to contest an administrative action is largely a question of law.[1] 27 O.S.1981 § 7.1 *et seq.* is a legislative attempt to confer upon the Corporation Commission the regulation of coal pipelines in the state of Oklahoma. No provision for appeal is made in these sections. Art. 9, Oklahoma Constitution, which created the Corporation Commission and vested it with certain specific administrative powers [2] also provides that the leg- islature may confer additional powers and duties upon the Commission.[3] It further provides that from all orders of the Corporation Commission an appeal will be to this court by a "party affected" or by "any person deeming himself aggrieved".[4] The use of the word "person" along with the word "party" suggests that others than those technically a party to the proceeding before the Commission may appeal. The issue present, therefore, is whether MKT is a party affected or a person deeming himself aggrieved by Corporation Commission Order No. 238528 or both.

■ ETSI contends that MKT does not have standing to institute an appeal in this cause No. 27470 because MKT was not a party to that proceeding. The authority cited by ETSI does not support its contention under the facts of this case. To the contrary, the Oklahoma Railways Committee is an unincorporated association.[5] An unincorporated association has no legal entity or existence apart from its members.[6] MKT, as a member and component part of the Oklahoma Railways Committee, appeared before the Corporation Commission and opposed ETSI's application for license. We find, therefore, MKT was a party to this proceeding before the Corporation Commission.

ETSI next urges that MKT does not have standing to appeal cause No. 27470 because it has not been aggrieved by Commission Order No. 238528.

Oklahoma case law defines an "aggrieved party" as one whose pecuniary interest in the subject matter is directly and injuriously affected or one whose right in property is either established or divested by the decision from which the appeal is prosecuted. To render a party aggrieved by a decision, its adverse effect must be direct, substantial and immediate rather than con-

---

1. *National Motor Club of Okla. v. State Ins. Bd.,* 393 P.2d 511, 514 (Okl.1964).

2. Art. 9, § 18.

3. Art. 9, § 19.

4. Art. 9, § 20.

5. Tr.Vol. III, P. 454.

6. *Taxicab Driver's Local Union No. 889 v. Pittman,* 322 P.2d 159 (Okl.1958); See also H.L. Obleck, "Non-profit Corporations, Organizations, and Associations," p. 75, § 36 (3rd ed. 1974).

tingent on some possible remote consequence or a mere possibility of an unknown future eventuality.[7]

Oklahoma case law has not defined either a "party affected" or "any person deeming himself aggrieved". Here we are faced with the issue of whether a competitor belongs to one or both of the classes of "party affected" or "any person deeming himself aggrieved". The doctrine that a competitor belongs to the class of persons whose injury is sufficiently direct, substantial, and immediate to qualify as "aggrieved" has been adopted in several types of cases.

In *Cia Mexicana De Gas v. Federal Power Commission*,[8] a case brought under § 19(b) of the Natural Gas Act, the court thought it "clear" that a natural gas company which competed with a certificate applicant had standing to seek judicial review of the order granting the certificate.

In *National Coal Ass'n. v. Federal Power Commission*,[9] the National Coal Association and others filed petitions for review of an order of the Federal Power Commission granting a certificate of public convenience and necessity for the construction of a gas pipe line to supply the Atomic Energy Commission's plant at Oak Ridge, Tennessee. The court held that the petitioners, a trade association of competing coal companies and labor unions of their employees, were sufficiently aggrieved by the grant to maintain proceedings for review.

The U.S. Supreme Court has held that one threatened with financial loss through increased competition resulting from a Federal Communications Commission is "aggrieved" and entitled as such to a review of the order by the Court of Appeals.[10]

In an action by a data processor's association and data processing corporation to review rulings of the Comptroller that national banks, including defendant bank, could make data processing services available to other banks and to bank customers, the Supreme Court held that plaintiffs, as competitors of national banks which are engaging in data processing services, were "aggrieved" persons who, under the Administrative Procedure Act, were entitled to judicial review of the ruling.[11]

We think the reasoning of this authority is sufficient to support the proposition that a competitor whose pecuniary interest is directly and injuriously affected and to whom the adverse effect of the Commission's order is direct, substantial and immediate is a "party affected" and/or "any person deeming himself aggrieved" within the meaning of Art. 9, § 20, Oklahoma Constitution.

MKT in an affidavit filed with its Response to Motion to Dismiss stated that in 1981 MKT transmitted 12,540 carloads of coal from Wyoming to the Grand River Dam Authority (GRDA) at Pryor, Oklahoma, in 1982, 17,144 carloads, through the first six months of 1983, 7,044 carloads, with an estimate of an additional 11,500 for a total of 18,594 carloads in 1983.

GRDA has contracted with Carter Mines at Rawhide Junction, Wyoming, to purchase a minimum of 18,000 carloads per year from 1984 through 1987 and from 1988 through 1999, a minimum of 20,000 carloads per year. Therefore, MKT projects that it will deliver a minimum of 18,000 carloads of coal per year to the GRDA from 1984 through 1987, inclusive. From 1988 through 1999, a minimum of 20,000 carloads per year.

7. *Cleary Petroleum Corp. v. Harrison*, 621 P.2d 528, 530 (Okl.1980); *Sarkeys v. Ind. Sch. Dist. #40 Cleveland Co. Okl.*, 592 P.2d 529, 536 (Okl. 1979); *Steincamp v. Steincamp*, 593 P.2d 495, 497 (Okl.1979).

8. 167 F.2d 804, 805–806 (5th Cir.1948).

9. 191 F.2d 462 (D.C.Cir.1951).

10. *Federal Communications Commission v. Sanders Brothers Radio Station*, 309 U.S. 470, 476–477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940); *Scripps-Howard Radio Inc. v. Federal Communications Commission*, 316 U.S. 4, 14–15, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942).

11. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed. 184 (1969).

GRDA had advised that unit number two will become operational effective January 1, 1986. It has contracted a minimum 9,000 carloads per year from 1986 through 1988 and 10,000 per year from 1987 through 1999.

MKT claims that it would lose fifty percent (50%) of the carload shipments covering unit number one and all shipments for unit number two if the license authorized in case No. 27470 (Order No. 238528) is issued and ETSI is allowed to build its coal slurry pipeline.

MKT presently earns approximately four hundred fifty nine dollars ($459.00) per carload. The total projected loss of income to MKT for both units number one and two commencing January, 1986 through 1999 is one million two hundred sixty-two thousand two hundred fifty dollars ($1,262,250). MKT's pecuniary interest in the shipping of coal from Wyoming to Oklahoma is directly and injuriously affected by the construction of the ETSI coal slurry pipeline. Upon completion of the coal slurry pipeline, the adverse effect upon MKT will be direct, substantial and immediate.

Under these facts we find, therefore, that MKT as one threatened with financial loss through increased competition from the Commission's order is a "party affected" or a "person deeming himself aggrieved" under Art. 9, § 20, Oklahoma Constitution, and has standing to appeal Commission Order No. 238528.

## II.

DOES THE OKLAHOMA CORPORATION COMMISSION HAVE SUBJECT MATTER JURISDICTION OVER ETSI?

MKT urges on appeal that the Oklahoma Corporation Commission lacks subject matter jurisdiction over coal pipelines. The pertinent Oklahoma Constitutional provisions are as follows:

Art. 9, § 18, reads as follows:

"The Commission shall have the power and authority and be charged with the duty of supervising, regulating, and controlling *all transportation and transmission companies* doing business in this State...." (emphasis added)

Art. 9, § 34, defines transportation and transmission companies as follows:

"As used in this Article, the term *'transportation company' shall include* any company, corporation, trustee, receiver or any other person owning, leasing or operating for hire a railroad, street railway, canal, steamboat line, and also any freight car company, car corporation, or company, trustee or persons in any way engaged in such business as a common carrier over a route acquired in whole or in part under the right of eminent domain ... the term *'transmission company' shall include* any company, receiver or other person owning, leasing or operating for hire any telegraph or telephone line; ...." (emphasis added)

The above-stated provisions do not expressly include a coal slurry pipeline. We must determine, therefore, whether the express list of entities following the words "shall include" is an exhaustive, and thereby exclusive, listing of all the types of companies and corporations to be regulated by the Commission or whether the listing is merely examples of the types of companies and corporations to be regulated by the Commission?

MKT contends that the words following transportation company and transmission company in Art. 9, § 34 have been held by this court to be words of limitation.[12] In *Application of Central Airlines*, this court said:

"We hold that since aircraft transportation is not expressly nor by necessary implication included within the meaning of the words 'transportation company' as used in the Constitution, there was no grant of power to the Corporation Commission to exercise jurisdiction thereover." [13]

---

**12.** *Application of Central Airlines,* 199 Okl. 300, 185 P.2d 919 (1947).

**13.** Id., 185 P.2d at 924–925.

However, aircraft transportation and a coal slurry pipeline are easily distinguishable. Art. 9, § 34 includes in its definition of "transportation company" those entities "engaged in such business as a common carrier over a route acquired in whole or in part under the right of eminent domain...." Clearly, aircraft transportation would not fall within this definition of a common carrier, while a coal pipeline would.

In *Data Transmission Co. v. Corporation Commission*[14] this court held that the Commission had jurisdiction to regulate a company providing intrastate microwave transmission of two-way telecommunications. The court stated:

"Datran claims because it is neither a telephone nor a telegraph company it is not a transmission company [within the meaning of Art. 9, § 34] and thus not subject to regulation by Commission.

We do not find this constitutional provision so limited. At the time of the adoption of this provision of the Oklahoma Constitution, computers and microwave data transmission were not in existence. Under these circumstances we feel it would be unwise to infer that by specifically including only telephone and telegraph companies, the founders of our Constitution meant to exclude forever regulation by the Commission of companies who would transmit through a neotoric medium."

█ We find the reasoning of *Data Transmission* to be sound in addressing the realities of our changing world and sufficient to support a decision to include a coal slurry pipeline within the meaning of "transportation company". Just as the words "shall include" were held not to be words of limitation in determining what is subject to regulation by the Commission as a transmission company, we find that a coal slurry pipeline is subject to Commission regulation as a "transportation company" within the meaning of Art. 9, § 34.

14. 561 P.2d 50, 56–57 (Okl.1977).

We also find that a coal pipeline falls within that category in Art. 9, § 34, "engaged in such business as a common carrier over a route acquired in whole or in part under the right of eminent domain".

In addition, it is important to our consideration of the issue of subject matter jurisdiction to note that the Commission has jurisdiction over public service corporations.[15] Art. 9, § 34 also provides the definition for the term "public service corporation":

"The term 'public service corporation' *shall include* all transportation and transmission companies, all gas, electric, heat, light and power companies, and all persons, firms, corporations, receivers or trustees engaged in said businesses, *and all persons, firms, corporations, receivers or trustees authorized to exercise the right of eminent domain or having a franchise to use or occupy any right of way,* street, alley or public highway, whether along, over or under the same, *in a manner not permitted to the general public, and all* persons, firms, corporations, receivers and trustees *engaged in any business which is* a public utility or a public service corporation, *at the present time or which may hereafter be declared to be a public utility or a public service corporation."* (emphasis added)

Once again we must determine whether ETSI comes within the general language following the specific list of entities defined as 'public service corporations' under Art. 9, § 34.

Appellant MKT urges that the phrase "all persons, firms, corporations, receivers or trustees authorized to exercise the right of eminent domain" should be interpreted to apply only to those specific entities imbued with the right of eminent domain *at the time of the adoption of the Constitution.* Appellant cites no case law for this proposition.

15. Art's. 18 and 34.

In *French v. Ayres*,[16] this court in deciding whether an oil pipeline company was a "public service corporation" found that it was even though not expressly named as such. It was also found to be a common carrier. We think that *French* belies the argument of MKT because at the time of the adoption of the Oklahoma Constitution, oil pipeline companies did not have the right of eminent domain but were subsequently given this right in 1910.[17]

27 O.S. §§ 7.1–7.11 is the legislation passed to govern and regulate coal pipelines in the state of Oklahoma.[18] Section 7.1 requires all coal pipelines transporting coal in and through this state must first be licensed to operate by the Oklahoma Corporation Commission. Section 7.2 grants all pipelines authorized to operate under Section 7.1 the power to exercise the right of eminent domain as provided for railroad corporations.

█ We think the reasoning of *French*[19] is sound in holding that an oil pipeline, although not expressly named and not authorized to exercise the power of eminent domain at the time the Oklahoma Constitution was enacted, is a public service corporation as defined in Art. 9, § 34. In addition, the language in Section 34, "at the present time or which may hereafter be declared to be . . . a public service corporation" further refutes the proposition that the term "public service corporation" was intended to be limited to those entities having the right of eminent domain at the time of the adoption of the Oklahoma Constitution. We find that a coal pipeline is a public service corporation and a common carrier within the meaning of Art. 9, § 34.

We hold, therefore, that ETSI as a coal pipeline is a "transportation company", a "common carrier" and a "public service corporation" within the meaning of Art. 9, § 34, Oklahoma Constitution, and as such,

that the Oklahoma Corporation Commission has subject matter jurisdiction over ETSI.

## III.

### HAS THE REGULATION OF ETSI BEEN PRE-EMPTED BY THE FEDERAL GOVERNMENT?

Appellant also argues that the regulation of interstate coal slurry pipelines has been pre-empted by Congress vesting the Interstate Commerce Commission (ICC) with exclusive regulatory control pursuant to the Interstate Commerce Act.[20] Appellant submits, therefore, that any action by the Commission in issuing a license to operate an interstate coal slurry pipeline is void for the reason of Federal pre-emption and any condemnation action taken by ETSI is unauthorized because it has not been validly licensed.

The gist of appellant MKT's argument is that the Interstate Commerce Act and the transportation policy set forth therein is exclusive and so pervasive as to make reasonable the inference that Congress left no room for state action on the subject of coal pipelines. Second, because of pre-emption by the Federal Government, the Commission Order issued in this case is void. Then the appellant argues the flip-side of the above proposition that, because the order is void, ETSI cannot exercise the power of eminent domain pursuant to Section 7.2 because ETSI has not been validly licensed pursuant to Section 7.1.

█ Within constitutional limits, Congress may apparently preempt state law in four specific instances:

(1) By so stating in express terms.[21]

(2) By a scheme of federal regulation so pervasive as to make reasonable the

---

**16.** 201 Okl. 494, 207 P.2d 308 (1949).

**17.** 52 O.S. 1981 § 3.

**18.** Effective October 1, 1977.

**19.** Supra at note 10.

**20.** 49 U.S.C. §§ 10101–11917.

**21.** *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

inference that Congress left no room to supplement it.[22]

(3) To the extent state law actually conflicts with federal law. Those areas where compliance with both federal and state regulation is a physical impossibility.[23]

(4) Where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[24]

Pre-emption doctrine stems from the Supremacy Clause of the United States Constitution[25] and invalidates any state law that contradicts or interferes with an Act of Congress. Pre-emption arises in a wide array of contexts, from circumstances in which federal and state laws are plainly contradictory to those in which the incompatibility between state and federal laws is discernible only through inference.[26] This case presents no issue of express pre-emption; nothing on the face of the Transportation Policy explicitly indicates whether Congress intended to pre-empt State authority over coal slurry pipelines. Therefore, in order to determine whether preemption is otherwise indicated, we must inquire more deeply into the intention of Congress and the scope of the pertinent state legislation. We turn, then, to the laws in dispute to ascertain their structure and purpose.

The Interstate Commerce Act at § 10101, sets forth the Federal government's "Transportation Policy".

"... [I]t is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and—

(1) in regulating those modes—

... (E) *to cooperate with each State and the officials of each State on transportation matters;....* (emphasis added)

Under subchapter I—"Rail, Rail-Water, Express and Pipeline Carrier Transportation,"[27] Section 10501(c) states:

"This subtitle does not affect the power of a State, in exercising its police power, to require reasonable intrastate transportation by carriers providing transportation subject to the jurisdiction of the Commission under this subchapter unless (1) the transportation is deemed to be subject to the jurisdiction of the Commission pursuant to Section 11501(b)(4)(B)[28] of this title, or (2) the State requirement is inconsistent with an order of the Commission issued under this subtitle or is prohibited under this subtitle. (footnote added).

Section 10501. General jurisdiction.

(a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation

(1)(c) by pipeline or by pipeline and railroad or water when transporting a commodity other than water, gas, or oil.

(a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation

**22.** *Fidelity Federal Savings and Loan Ass'n. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed. 664 (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

**23.** *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963).

**24.** *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

**25.** See U.S. Const. Art. VI, cl. 2: "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land ... anything in the Constitution or laws of any state to the contrary

notwithstanding."; *Gibbons v. Ogden,* 9 Wheat 1, 211, 6 L.Ed. 23 (1824).

**26.** Compare *McDermott v. Wisconsin,* 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754 (1913) (invalidating state law directly conflicting with federal regulations) with *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971) (holding wrongful discharge action brought in).

**27.** 49 U.S.C. §§ 10501–10562.

**28.** Section 11501(b)(4)(B) applies only to rail carriers and is not applicable in this case.

(1)(c) by pipeline or by pipeline and railroad or water when transporting a commodity other than water, gas, or oil.

Title 27, Oklahoma Statutes is entitled "Eminent Domain". Sections 7.1–7.11 addresses the transportation of coal by pipeline in or through the state of Oklahoma. Section 7.1 subjects all coal pipelines to the jurisdiction of the Corporation Commission and requires all coal pipelines must be licensed to operate by the Commission. Section 7.2 grants all coal pipelines authorized to operate under Section 7.1 the power to exercise the right of eminent domain as provided for railroad corporations.

Before the Commission can issue a license, Section 7.1 requires the Commission to make the following determinations:

1. That there is a public need and necessity for the proposed pipeline.

2. That Applicant had established a showing of economic feasibility for the proposed pipeline.

3. That Applicant had produced legal proof of adequate supplies of water to transport coal by pipeline during the life of the contract.

4. That Applicant's rates and charges will be regulated by governmental authority to insure that the rates and charges shall be just and reasonable, non-discriminatory and offer no preference or advantage to any person, corporation, entity or group.

5. That the foreign corporations which compose the Applicant have become domesticated in Oklahoma.

6. That any time eminent domain is exercised pursuant to the Act the property owner shall be compensated for all damages associated with the taking of the land.

Such a showing is required before a coal pipeline company will be allowed to exercise the right of eminent domain under

Section 7.2. The act is structured around the legislative concern that the exercise of the traditional state power of eminent domain in the construction of a coal pipeline company be in a lawful and orderly manner by an economically feasible company.

The United States Supreme Court has repeatedly affirmed its position on federal law pre-empting state law as follow:

"[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."[29]

"The only requirements consistently recognized have been that the [state] regulation not discriminate against or place an embargo on interstate commerce, that it safeguard an obvious state interest, and that the local interest at stake outweigh whatever national interest there might be in the prevention of state restrictions."[30]

"Where the [state] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[31]

In this case, Congress has not "unmistakably ordained" that the states may not regulate the exercise of their traditional power of eminent domain with respect to the acquiring of pipeline right-of-ways. Nor has Congress "unmistakably ordained" that the states cannot determine the economic feasibility of a proposed coal pipeline before it is constructed; nor that the states cannot require that a coal pipeline be regulated by government authority, either state or federal to insure just and reasonable

29. *Florida Lime and Avocado Growers Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

30. *Cities Service Co. v. Peerless,* 340 U.S. 179, 186–87, 71 S.Ct. 215, 220, 95 L.Ed. 190 (1950).

31. *Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

rates. Nothing in the Act expressly refers to federal pre-emption with respect to these matters.

Nor is there any indication that the subject matter at issue here—the construction of a coal slurry pipeline—is of the sort that "permits no other conclusion" but that it is governed by federal and not state regulation. After all, state law normally governs the condemnation of real property through the exercise of the right of eminent domain. For the state of Oklahoma to attempt to insure that before this right is excised, the party wishing to exercise such right is among other things, economically sound and government regulated does not pose an obstacle to the transportation policy as expressed in the Act. To the contrary, for the state of Oklahoma to exercise these traditional state powers, as in this case, supplements the Act and is complementary to an orderly effectuation of the purposes of the Act.

Certainly, preemption arises when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress".[32] The regulation of the right of eminent domain does not interfere with the purpose insofar as such regulation insures an orderly effectuation of an interstate coal slurry pipeline. We find, therefore, that the provisions of 27 O.S. 1981 §§ 7.1–7.11 do not frustrate the federal transportation policy.

We hold that the regulation of coal pipelines by the Oklahoma Corporation Commission under the authority of 27 O.S. 1981 §§ 7.1–7.11 is not pre-empted by the federal transportation policy as set forth in 49 U.S.C. § 10101 *et seq.*

## IV.

### ARE 27 O.S. 1981 §§ 7.1–7.11 UNCONSTITUTIONAL?

■ MKT contends that the sections in question are unconstitutional or a violation of the Interstate Commerce Act because they impose a licensing requirement on an interstate activity. Appellant cites *Buck v. Kuykendall,*[33] *George W. Bush and Sons Co. v. Maloy*[34] and *Continental Pipeline Company v. Belle Fourche Pipeline Company*[35] in support of this proposition.

*Buck* involved a Washington law which prohibited the use of state highways by buses transporting passengers for hire without issuance of a certificate by the director of public works and prohibited the issuance of the certificate where the territory was already adequately served. The Supreme Court held the law to be unconstitutional in so far as it prohibited operations of buses between a point in state and a point in another state over highways constructed with federal aid.

*Bush* dealt with a Maryland law which prohibited common carrier of freight by motor vehicle from using public highways over specified routes without a permit from the Public Service Commission, and gave the commission discretion in the matter of granting the permits. The Supreme Court held the law violated the Commerce Clause in so far as it prohibited operation in interstate commerce of trucks over state highways. In *Maloy* the Supreme Court upheld a lower court's denial of an injunction prohibiting the building of an interstate pipeline.

We find nothing in the cases which support the proposition that 27 O.S. 1981 §§ 7.1–7.11 are unconstitutional. We held above that these statutes regulate the traditional state power of the right to exercise eminent domain and are complementary to the effectuation of the pipeline to be constructed by ETSI. We hold, therefore, that 27 O.S. 1981 §§ 7.1–7.11 are not unconstitutional as a violation of the Interstate Commerce Act.

---

**32.** *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

**33.** 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925).

**34.** 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627 (1925).

**35.** 372 F.Supp. 1333 (D.Wyo.1974).

## V.

### IS ETSI A LEGAL ENTITY UPON WHICH THE RIGHT OF EMINENT DOMAIN CAN BE CONFERRED UNDER 27 O.S. 1981 §§ 7.1–7.11?

■ MKT argues that the section in issue applies only to "any pipeline company".[36] Because ETSI is a joint venture,[37] it is not a company within the purview of 27 O.S. 1981 §§ 7.1–7.11. MKT also contends that a joint venture was not intended to be included in the term "company or companies" as set forth in Art. 9, § 18, Oklahoma Constitution. Therefore, the Commission cannot grant a license to ETSI. MKT does not cite any authority in support of this contention.

Art. 9, § 18b defines company as follows: "As used in this article, the term 'Company' shall include associations and joint stock companies having any power or priviledges not possessed by individuals, and includes all corporations except municipal corporations and public institutions owned or controlled by the State."

This court has defined a joint adventure as follows:

[A]n association of persons to carry out a single business enterprise."[38]

Under Oklahoma law a joint adventure is not a distinct legal entity separate and apart from the parties composing it.[39] ETSI is a joint adventure of Arcoal Transportation, Inc., Bechtel Petroleum, Inc., Lehman Brothers Kuhn Loel, Inc., Slurco Corporation and Texas Eastern Slurry Transportation Company.[40] We find, therefore, that ETSI is an association comprised of parties having power and privileges not

possessed by individuals, and is a company as defined in Art. 9, § 18b and within the meaning of the term company in 27 O.S. 1981 § 7.1.

## VI.

### IS THE EVIDENCE SUFFICIENT TO SUPPORT CORPORATION COMMISSION ORDER NO. 238528?

On appeal from an Order of the Corporation Commission, this court must review the record to determine whether the Order is supported by substantial evidence. In *State ex rel. Cartwright v. Oklahoma Natural Gas Co.*,[41] we stated:

"In the absence of an assertion of a violation of right under the state or federal Constitution, the permissible scope of review by this court of orders of the Commission is limited to a determination of whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.[42] And, as we said in *Central Oklahoma Freight Lines, Inc. v. Corporation Commission*.[43]

"The term 'substantial evidence' means something more than a scintilla of evidence and means evidence that possesses something of substance and of relevant consequence such as carries with it fitness to induce conviction, and is such evidence that reasonable men may fairly differ as to whether it establishes a case."

"In the recent case of *El Paso Natural Gas Company v. Corporation Commis-*

---

**36.** 27 O.S. 1981 § 7.1.

**37.** The term "joint adventure" is usually used in Oklahoma case law for the term "joint venture".

**38.** *Bosworth v. Eason Oil Co.*, 202 Okl. 359, 213 P.2d 548, 551 (1950).

**39.** *W.B. Johnston Grain Company v. Self*, 344 P.2d 653, 658 (Okl.1959); *Parks v. Riverside Ins. Co. of America*, 308 F.2d 175 (10th Cir.1962).

**40.** Tr.Vol. III p. 454.

**41.** 640 P.2d 1341, 1346–47 (Okl.1982).

**42.** "Oklahoma Constitution, Art. IX, § 20; *Southern Union Gas Co. v. Texas Cty.*, etc., 564 P.2d 1004 (1977); *Tecumseh Gas System v. State*, Okl., 565 P.2d 356 (1977); *Application of Arkansas Louisiana Gas Company*, Okl., 558 P.2d 376 (1976); *Union Texas Pet., et al. v. Corporation Comm'n, et al.*, Okl. 651 P.2d 652 (1981)."

**43.** "484 P.2d 877 (Okl.1971)."

*sion of the State of Oklahoma, et al.,*[44] this court enunciated the rule that determining whether there is substantial evidence in support of the Commission's findings and conclusions, requires a review by this court of the whole of the evidence found in the record including such evidence which fairly detracts from the weight thereof."

In cases involving constitutional issues, this court must "exercise its own independent judgment of law and facts".[45]

Applying these guidelines, we will consider the objections to the order of the Commission raised by MKT. 27 O.S. 1981 § 7.1 requires, and the Commission specifically held,[46] that before it can issue a license pursuant to the act and after a public hearing, the Commission must make the following determinations:

1. That there is a public need and necessity for the proposed pipeline.

2. That Applicant had established a showing of economic feasibility for the proposed pipeline.

3. That Applicant had produced legal proof of adequate supplies of water to transport coal by pipeline during the life of the contract.

4. That Applicant's rates and charges will be regulated by governmental authority to insure that the rates and charges shall be just and reasonable, non-discriminatory and offer no preference or advantage to any person, corporation, entity or group.

5. That the foreign corporations which compose the Applicant have become domesticated in Oklahoma.

6. That any time eminent domain is exercised pursuant to the Act the property owner shall be compensated for all damages associated with the taking of the land.

On appeal, MKT challenges only (1) the sufficiency of the evidence to support the Commission's determination that ETSI es-tablished a showing of economic feasibility for the proposed pipeline and (2) that ETSI produced legal proof of adequate supplies of water to transport coal by pipeline during the life of the contract. Accordingly, those are the only evidentiary issues to be reviewed by this Court.

### ECONOMIC FEASIBILITY

Because ETSI's application was the first to be made under the 27 O.S. §§ 7.1–7.11 the Commission found it necessary to interpret and define certain portions of the Act. Appellant MKT claims that the Commission erred in its definition of "economic feasibility".

The Commission's legal staff, recognizing that the term "economic feasibility" had not been judicially or statutorily defined in Oklahoma, provided the Commission with some definitions from other jurisdictions, and then argued that economic feasibility as used in Section 7.1 meant "capable of successfully constructing, financing, operating and maintaining its pipeline through the state of Oklahoma with a reasonable degree of success." (TR. Vol. I, pp. 49–50).

The Commission's Order No. 208853 of February 17, 1982, fully addressed the issues presented and determined that:

1. To satisfy the statutory requirements in 27 O.S. 1981, § 7.1, "a showing of economic feasibility" for the proposed coal slurry pipeline, Applicant ETSI must demonstrate that it is capable of attracting sufficient capital to construct a coal slurry pipeline within the State of Oklahoma with a reasonable assurance of success, and capable of indemnifying the public at large during the construction and start-up periods.

. . . .

3. Through a legitimate exercise of its inherent police power, the State of Oklahoma by and through the Okla-

---

**44.** "640 P.2d 1336 (Okl.1981)."

**45.** Art. 9, § 20, Okla. Const.

**46.** Tr.Vol. VI, p. 599.

homa Corporation Commission in interpretation of Title 27 O.S. 1981, § 7.1, may legally require Applicant, ETSI, to demonstrate to this Commission the economic feasibility of the proposed coal slurry pipeline to and through the State of Oklahoma.[47]

The Commission then ordered ETSI to file information to establish the "economic feasibility" of the project as follows:

A. ETSI's ability to attract sufficient capital to finance the construction and start-up costs associated with the pipeline project.

B. ETSI's ability to insure protection to the public for potential liability which might arise during construction and initial operation of the pipeline project.

A review of the record indicates that the Commission's definition was accepted and relied upon by all parties including the Oklahoma Railways Committee (ORC) from that point forward. For example, on April 1, 1982, ORC filed its second Motion to Compel Production of Documents, alleging that ETSI had failed to produce documents in compliance with the Commission's Order of February 17, 1982. (Tr.Vol. IV, p. 512) The referee issued a report on April 15, 1982. ORC filed a motion for clarification of that report. (Tr.Vol. IV, p. 527)

After a hearing on May 24, 1982, the referee issued his findings. (Tr. Vol. IV, p. 530) ORC filed exceptions on June 8, 1982, utilizing and relying on the Commission's definition of economic feasibility, saying more information and discovery should be allowed. (Tr. Vol. IV, p. 531)

On November, 1982, the Commission heard the matter. (Tr. Vol I, pp. 128–147) On January 3, 1983, the Commission issued Order No. 230717. (Tr.Vol. V, p. 549) The Commission reiterated its definition of economic feasibility as contained in its previous order, overruled ORC's motion in part and granted it in part.

On January 20, 1983, ORC filed a motion for the Commission to reconsider that portion of its order denying the production of certain documents which ORC had requested. In that motion, ORC did not argue with the Commission's definition of economic feasibility. (TR. Vol. V, p. 552)

Even in its proposed Findings of Fact and Conclusions of Law, submitted after the public hearing, ORC's definition of economic feasibility: "reasonable assurance of success in obtaining capitalization and financing for the pipeline", did not differ from the Commission's own definition. (Tr.Vol. VI, p. 596; Conclusion No. 6)

ETSI argues that MKT cannot now raise this issue on appeal and in support cites *State ex rel. Cartwright v. Okl. Natural Gas*[48] wherein we held:

We therefore hold that matters which could have been presented before the Commission under rules governing proceedings before that body and which were not presented before the Commission either by affirmative evidence, objection or proceedings for review by the Commission are precluded from review by this court on appeal by a party who is adversary thereto.[49]

■ However, this case is distinguishable from the instant case. In *Cartwright*, the state failed to appeal from the report of the referee. Here, we have an order by the Commission en banc on MKT's motion to compel discovery. Orders on discovery matters are generally not appealable.[50] In addition, this is the first time for the term "economic feasibility" to be defined as used in 27 O.S. § 7.1 *et seq.*, we find that the Commission's definition which addresses ETSI ability (1) "to attract sufficient capital to finance the construction and start-up cost associated with the pipeline project" and (2) "to insure protection to the public for potential liability which might arise during construction and initial operation of the

---

47. Tr.Vol. III, p. 497.

48. Supra note 43.

49. Supra note 43 at 1346.

50. *Warren v. Myers*, 554 P.2d 1171 (Okl.1976). *Carman v. Fishel*, 418 P.2d 963 (Okl.1966).

pipeline project" to be a proper interpretation of the requirement of "a showing of economic feasibility". We hold, therefore, that the Commission did not err in its finding:

> "To satisfy the statutory requirements in 27 O.S. 1981, § 7.1 "a showing of economic feasibility" for the proposed coal slurry pipeline. Applicant ETSI must demonstrate that it is capable of attracting sufficient capital to construct a coal slurry pipeline within the State of Oklahoma with a reasonable assurance of success, and capable of indemnifying the public at large during the construction and start-up periods."[51]

## SUFFICIENCY OF THE EVIDENCE

■ MKT also urges that the evidence is insufficient to support the Commission's order as to (1) a showing of the economic feasibility of the proposed pipeline and (2) legal proof that adequate supplies of water have been acquired to conduct the transportation of coal by pipeline during the life of the contract.

### (1) Economic Feasibility

ETSI presented a great deal of evidence, through direct testimony and through exhibits, which demonstrated the economic feasibility of ETSI's proposed pipeline. ETSI's evidence showed that the parent corporations for the partners in the ETSI joint venture had already spent in excess of ninety million dollars on the project, through the pre-construction phase and that the partnership continued to fund ETSI's operating expenses of one million dollars per month.[52]

The detailed and extensive findings of fact and conclusions of law that the Commission made reflect the substantial evidence that was presented to the Commission. For example, Finding of Fact No.'s 14–17 and 23[53] state as follows:

14. That the parent corporations sponsoring this project, Texas Eastern Corporation, the Bechtel Group, Internorth, Inc., and Kansas-Nebraska Natural Gas Company are all substantial corporations with outstanding pipelining and slurry expertise. These parent corporations have spent in excess of $90,000,000 on the project to date and continue to pay operating expenses of $1,000,000 per month. Such capital outlay by the parent corporations indicates the continuing commitment of the parents to the Project.

15. That two major United States banks, Chase Manhattan and Morgan Guaranty, are the leading banks and financial advisors to ETSI's project. ETSI's proposed pipeline is economically feasible, and the necessary financing can be put together to build the project and put it into operation.

16. That ETSI has demonstrated that it has the ability to attract the necessary capital to construct the pipeline and put it into operation and that ETSI is successfully proceeding with the prerequisites to actually obtaining shipper contracts, as well as financing to build the pipeline.

17. That the South Dakota Water Management Board, after a public hearing, has previously determined that ETSI's proposed pipeline is technically and economically feasible.....

23. That pipelines are relatively insensitive to cost escalation due to their capital intensive nature, as compared to railroads whose costs are almost 50% in labor alone. This factor indicates that inflationary trends will not have the impact upon pipelines that such trends have upon railroads.

We find the Commission's order with respect to the economic feasibility of ETSI is supported by expert testimony constituting

**51.** Supra note 40.

**52.** Tr. Vol. I, p. 172.

**53.** Tr.Vol. VI, p. 599.

substantial evidence and by the applicable law.

(2) Adequate Water Supply

Appellant MKT argues that the Commission erred in its interpretation and application of the Act's water requirement in that (1) the Commission should have determined the water issue before it even heard ETSI's application and (2) the Commission erred in finding that ETSI met the statute's requirement since they contemplate that the Applicant must have shipper contracts in hand before the adequacy of Applicant's water supplies can be measured. Appellant also argues that the record lacks substantial evidence to support the Commission's finding that ETSI established legal proof of adequate water supplies.

Testimony before the Commission was undisputed, however, that ETSI has a fully documented present legal right to use Oahe water, or, as an alternate second choice, Madison Formation water.[54] No one offered any evidence to refute those facts. No one offered evidence to question the reliability, adequacy, or actual physical availability of either of those water sources. MKT further argues that the requirement is to "have produced legal proof that adequate supplies of water have been acquired" is in fact a prerequisite for any consideration of an application by the Commission. Once again, this is an argument which was never raised to the Commission or to the referee and should not be allowed to be raised on appeal for the first time.

In any event, it is contra to the plain language of Section 7.1. The language of § 7.1 does not contemplate a two-tiered hearing by the Commission. The Act speaks of "a" public hearing. The legislature correctly determined that all the necessary issues could be determined in one hearing. MKT contends that under § 7.1, "Unless and until there is a yardstick (contract for shipment) by which the adequacy of the water supplies can be measured,

ETSI's proof fails."[55] This is an untenable position. At the hearing before the Commission, Oklahoma Railways Committee's main witness admitted that no prudent utility would sign a contract for shipment with an Applicant such as ETSI until the Applicant had secured its license to exercise eminent domain.[56]

We find there is substantial evidence in the record to support Findings of Fact No.'s 18, 19 and 20 [57] by the Commission as follows:

18. That ETSI's pipeline will use 20,000 acre-feet of water per year and that ETSI has acquired contractual rights from the State of South Dakota and the United States Government to use up to 50,000 acre-feet of water per year from the Oahe Reservoir in South Dakota. Further, that although lawsuits have been filed in both South Dakota and Nebraska challenging the validity of ETSI's Oahe water rights, no court has entered any order or injunction forbidding ETSI to use the water. ETSI is legally entitled to use its water sources immediately if ETSI chooses to do so.

19. That ETSI has also acquired a backup source of water from the State of Wyoming which consists of permits to drill wells in Niobrara County and to use up to 20,000 acre-feet of water per year from the Madison Formation. ETSI has the legal right to use this water if the primary water source should be unavailable.

20. That water discharge permits have been issued to ETSI by the Oklahoma Water Resources Board on February 8, 1983, permitting ETSI to discharge its water after it is separated from the coal at three different points in Oklahoma.

54. Tr.Vol. I, pp. 222–223, 242–246, 265.

55. MKT's Brief at p. 30.

56. Tr.Vol. II, pp. 405, 431.

57. Tr.Vol. VI, p. 599.

We find, therefore, the Commission's order with respect to ETSI's having produced legal proof that adequate supplies of water have been acquired as required by Section 7.1 is supported by expert testimony constituting substantial evidence and by the applicable law.

### CONCLUSION

We hold that the Corporation Commission has subject matter jurisdiction over ETSI pursuant to 27 O.S. 1981 § 7.1 *et seq.* We further hold that the regulation of ETSI pursuant to 27 O.S. 1981 § 7.1 *et seq.* has not been pre-empted by the federal government; that these sections are, therefore, constitutional; that the right of eminent domain can be conferred under these sections upon ETSI as a joint venture; and that although MKT has standing to appeal the issuance of Corporation Commission Order No. 238528, the evidence in the record is sufficient to support the order under the statutory standards set forth in 27 O.S. 1981 § 7.1, *et seq.*

DOOLIN, V.C.J., and LAVENDER, HARGRAVE and WILSON, JJ., concur.

SIMMS, C.J., and HODGES and OPALA, JJ., dissent.

KAUGER, J., disqualified.

HODGES, Justice, dissenting.

There is a question that the appellee, ETSI, is no longer a viable entity and is in fact defunct. If so, the issues presented on appeal are moot.

An attempt to elicit such information for the record was unsuccessful when ETSI failed to respond to our show cause order of July 16, 1985. This Court has a duty to inquire into its jurisdiction. *City of Tulsa v. Chamblee*, 188 Okl. 94, 106 P.2d 796 (1940). I, therefore, would direct that the Corporation Commission hold an evidentiary hearing with a view to determining the current status of the appellee, ETSI, and report its findings and conclusions to this Court.

I am authorized to state that Chief Justice SIMMS and Justice OPALA join me in this Dissenting Opinion.